Domingo TURRO, Appellant,

v.

The STATE of Texas, State.

No. 2–91–027–CR.

Court of Appeals of Texas,
Fort Worth.

July 3, 1997.

Mary B. Thornton, Fort Worth, for Appellant.

Tim Curry, Criminal District Attorney, Charles M. Mallin, Chief of the Appellate Section, Danielle A. Legault, Assistant Criminal District Attorney, Fort Worth, for Appellee.

Before DAY, LIVINSTON and RICHARDS, JJ.

## OPINION ON SECOND REMAND

DAY, Justice.

A jury found appellant Domingo Turro guilty of murder. *See* TEX. PENAL CODE ANN. § 19.02 (Vernon 1994). The trial court assessed punishment at 45 years' confinement in the Institutional Division of the Texas Department of Criminal Justice. In eleven points of error, Turro complains that:

- the evidence is insufficient to support his conviction;
- the trial court erred by denying his motion for an instructed verdict and motion in arrest of judgment;
- the trial court erred by overruling his objections to inadmissible evidence;
- the trial court erred by denying his challenge for cause of a prospective juror; and
- the trial court erred by making an affirmative deadly weapon finding without sufficient notice.

### BACKGROUND

Domingo Turro was indicted on July 2, 1987 for the murder of his girlfriend Carolyn Williams. The case was first tried in May 1989 and a mistrial resulted. Subsequently in a second trial that began on December 18, 1990, a jury found Turro guilty. On appeal, we reversed the conviction and rendered a judgment of acquittal, finding that the State had failed to rebut a reasonable hypothesis theory of accidental death. *See Turro v. State*, 837 S.W.2d 232, 234 (Tex.App.—Fort Worth 1992). After granting petition for discretionary review, the Texas Court of Criminal Appeals reversed and remanded the cause to this court for further consideration. *See Turro v. State*, 867 S.W.2d 43 (Tex.Crim. App.1993). According to the Court of Criminal Appeals, we incorrectly applied the "reasonable outstanding hypothesis" construct in our first opinion by failing to view the evidence in the light most favorable to the verdict. *See id.* at 47–48. In light of that holding, we reevaluated our prior decision on remand.

We again attempted to consider all the evidence in the light most favorable to the verdict. We determined that, viewed in this light, the State had failed to exclude every reasonable hypothesis but guilt because it had failed to rebut the reasonable hypothesis of accidental death, and, we again reversed the conviction, rendering a judgment of acquittal. *See Turro v. State*, No. 2–91–027–CR, slip op. at 2 (Tex.App.—Fort Worth July 27, 1995) (not designated for publication). The Texas Court of Criminal Appeals, with three justices dissenting, again granted a petition for discretionary review and reversed and again remanded the cause to this court. *See Turro v. State*, No. 964–95, slip op. at 1–2 (Tex.Crim.App. Mar. 20, 1996) (not designated for publication). The Court of Criminal Appeals has instructed us to reconsider our opinion under the correct standard of review and view all the evidence in the light most favorable to the verdict. *See id.* slip op. at 2. In light of those instructions, we reconsider our earlier opinions and affirm the judgment of the trial court.

### SUFFICIENCY OF THE EVIDENCE

*Legal Sufficiency—Reasonable Outstanding Hypothesis*

In his first and second points of error, Turro argues that there is insufficient evi-

dence to support his conviction for murder. According to Turro, the facts and opinions admitted into evidence left reasonable hypotheses that Carolyn Williams's death resulted from an act of God, accidental causes, or both.

The evidence at trial was circumstantial. However, the standard of review is the same for direct and circumstantial evidence cases. *See Butler v. State*, 769 S.W.2d 234, 238 (Tex.Crim.App.1989). In reviewing the legal sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to the verdict. *See Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex.Crim. App.1992), *cert. denied*, 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993). The critical inquiry is whether, after so viewing the evidence, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim. App.1988). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979).

The legal sufficiency of the evidence is a question of law. The issue on appeal is not whether we as a court believe the State's evidence or believe that the defense's evidence outweighs the State's evidence. *See Matson v. State*, 819 S.W.2d 839, 846 (Tex.Crim.App.1991); *Wicker v. State*, 667 S.W.2d 137, 143 (Tex.Crim.App.), *cert. denied*, 469 U.S. 892, 105 S.Ct. 268, 83 L.Ed.2d 204 (1984). We may not overturn the verdict unless it is irrational or unsupported by proof beyond a reasonable doubt. *See Matson*, 819 S.W.2d at 846. The applicable standard for cases tried before November 16, 1991, is that we cannot sustain a conviction based on circumstantial evidence if the circumstances do not exclude every other reasonable hypothesis except that of the defendant's guilt.[1] *See Madden v. State*, 799 S.W.2d 683, 690 (Tex.Crim.App.1990), *cert. denied*, 499 U.S. 954, 111 S.Ct. 1432, 113 L.Ed.2d 483 (1991); *Autry v. State*, 626 S.W.2d 758, 761 (Tex.Crim.App.), *cert. denied*, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982). Proof amounting only to a strong suspicion or mere probability is insufficient. *See Autry*, 626 S.W.2d at 761. Further, it is not required that the circumstances should, to a moral certainty, actually exclude every hypothesis that the act may have been caused by some other means, but that the hypothesis is a reasonable one consistent with the circumstances and the facts proved. *See Carlsen v. State*, 654 S.W.2d 444, 447 (Tex.Crim.App.1983). However, the supposition that another means may have caused the act must not be out of harmony with the evidence. *See Autry*, 626 S.W.2d at 761.

Once a defendant is found guilty, we as a reviewing court may not second guess the factfinder as long as a rational trier of fact could conclude that any remaining doubts or outstanding hypotheses are not reasonable. *See Boulden v. State*, 810 S.W.2d 204, 206 (Tex.Crim.App.1991). In addition, the evidence to support the verdict is not necessarily rendered legally insufficient simply because the defendant presents a different version of the events. *See Anderson v. State*, 701 S.W.2d 868, 872 (Tex.Crim.App. 1985), *cert. denied*, 479 U.S. 870, 107 S.Ct. 239, 93 L.Ed.2d 163 (1986). In fact, it is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *See Johnson v. State*, 871 S.W.2d 183, 186 (Tex.Crim.App. 1993), *cert. denied*, 511 U.S. 1046, 114 S.Ct. 1579, 128 L.Ed.2d 222 (1994); *Russell v. State*, 665 S.W.2d 771, 776 (Tex.Crim.App. 1983), *cert. denied*, 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752 (1984). However, if the evidence supports an inference other than the guilt of the defendant, a finding of guilt beyond a reasonable doubt is not a rational

---

1. The Texas Court of Criminal Appeals has held that the State no longer must exclude every reasonable hypothesis except that of the defendant's guilt. *See Geesa v. State*, 820 S.W.2d 154, 161. However, *Geesa* affects only those cases tried after November 6, 1991 and does not apply to this case. *See id.* at 165.

finding. *See Freeman v. State*, 654 S.W.2d 450, 456 (Tex.Crim.App.1983) (op. on reh'g).[2]

█ The evidence viewed in the light most favorable to the verdict shows that around 9:00 to 9:30 p.m. on May 3, 1987, Turro tried to drive his car through a low-water crossing during a heavy rain storm. Flood waters swept Turro's car and its occupants into a rain-swollen tributary of Sycamore Creek. In a pretrial statement to police, Turro stated that he and Williams, a passenger, struggled to keep from drowning, that he grabbed Williams around the neck, and that she held on to him as well. Turro managed to escape from the rain-swollen creek, but Williams was swept downstream.

Frances DeLaRosa, an eyewitness, testified that she observed Turro's car drive into the low-water crossing, stop, and attempt to back up before being swept into the creek. She heard screams coming from the car, but could not see the occupants. Both DeLaRosa and her husband testified that Turro walked from the creek soaking wet, visibly shaken, and talking about his wife being lost and swept down the creek.

Williams's body was found the next day, some distance downstream, nude, and bent over some tree limbs near the side of the creek. Law enforcement officials who responded to the scene characterized Williams's death as an accidental drowning. J.M. Garvin of the Fort Worth Police Department supervised the investigation into Williams's death. As part of the investigation, Garvin, with the assistance of Manny Reyes (a Spanish–English translator), obtained Turro's written account of the accident. The officers then examined Turro's house, located a few blocks from the low water crossing, and his car. No evidence inconsistent with accidental drowning was discovered in this investigation.

Conversely, when Dr. Nizam Peerwani, the Chief Medical Examiner of Tarrant County conducted an autopsy of Williams's body, he concluded that she died from manual strangulation, rather than drowning, and ruled her death a homicide. Based primarily on Peerwani's findings, the State prosecuted Turro for Williams's murder, advancing the theory that Turro killed Williams and was on his way to dump her body when his car washed into the creek.

Peerwani testified that the autopsy revealed physical evidence inconsistent with conditions typically found in a drowning victim. First, the body was found completely nude. Peerwani stated that recovering the body nude was remarkable because Williams was allegedly clothed when she entered the water. Peerwani's opinion was that if Williams was wearing blue jeans, as Turro alleged in his statement, she probably would have been recovered in the jeans, or at least would exhibit physical indications that the jeans were torn off her body.

The second important factor in Peerwani's findings was the absence of rigor in the body when it arrived at the morgue.[3] Peerwani first observed the body at around 2:30 p.m. on May 4, 1987, approximately seventeen hours after the alleged drowning. Based on the absence of rigor at that time, Peerwani concluded that Williams had been dead for at least twenty-four hours. In other words, Williams was dead when her body entered the water on the evening of May 3, 1987.

An external examination of the body revealed multiple pre- and post-mortem abrasions, lacerations, and contusions. Peerwani also discovered some curvilinear abrasions on the left side of Williams's neck. He testified

---

2. *Freeman* was also overruled by *Geesa*, 820 S.W.2d at 161, but again *Geesa* does not apply to this case. *See id.* at 165.

3. Rigor (or rigor mortis) is the post-mortem stiffening of the body. Peerwani testified that in an ambient environment of about 75° Fahrenheit, rigor may begin as early as two hours after death. It then takes about eight to twelve hours for the entire body to stiffen. The body then stays stiff for approximately twelve hours. Rigor then begins to fade as the body decomposes, and the body becomes flaccid over the next twelve to twenty-four hours. The onset and cessation of rigor is both temperature and chemical dependent. Although rigor begins simultaneously in all of the muscles of the body, smaller muscles with less mass are overtaken by rigor at a faster rate, and the fading of rigor follows a similar pattern. Based on Williams's age and the mild temperature on the date of her death, Peerwani believed that rigor would have developed normally in her body.

that such scratches are often evidence of a manual strangulation victim's attempt to free the stranglehold on the neck. Peerwani further testified that the autopsy revealed pinpoint hemorrhages known as petechiae in the covers of her eyeballs and in the inner linings of her eyelids. Peerwani's opinion was that such findings are typical of manual strangulation.

The internal examination of the body revealed deep hemorrhages of the strap muscles in Williams's neck. Additionally, Peerwani considered some negative findings remarkable. For example, no frothy fluid or hemorrhagic frothy fluid existed in the trachea or the bronchioles. He estimated that in at least 90 percent of drowning cases fluid passes through the mouth and nose, into the trachea, and subsequently into the bronchioles. Typically, such fluid combines with air, producing a large quantity of froth. Drownings can be "dry" with no frothy fluid, but this is very rare and only occurs in about 10 percent of drowning cases. Peerwani testified that, in his opinion, if Williams had been a drowning victim, he would have found evidence of this frothy edema, but he found none.

Finally, Peerwani discovered that food had been aspirated into Williams's trachea, windpipe and air spaces with some chemical tracheitis.[4] He concluded that if Williams had been a victim of a wet drowning and had aspirated food from the stomach into her trachea, she also would probably have been able to aspirate water—and she most likely would have. Aspirating water would have created large amounts of the frothy fluid in the trachea bronchioles. But there was no water in Williams's lungs.

Williams's death certificate listed her official date of death as May 4, 1987, the date her body was discovered, despite Peerwani's conclusion that Williams was dead when she entered the water on the previous day. According to Peerwani, May 4, 1987 "is the date

when [he was] absolutely certain she was dead."

Turro did not testify at the guilt-innocence or punishment phases of the trial. Turro now complains, in his first and second points of error, that the evidence is insufficient to prove he murdered Williams by manual strangulation. He contends that no one has eliminated the possibility that Williams died from other causes, namely accidental drowning. Turro specifically points to the expert testimony of Dr. Linda Norton, a physician and forensic pathologist, who disagreed with Peerwani's autopsy findings.

Norton testified that the rigor pattern in Williams's body was consistent with an accidental drowning. The duration of rigor may vary widely from one situation to the next; consequently, Norton stated that reliance on rigor to pinpoint the time of death is "dangerous." She testified that morgue photographs show that there was rigor in Williams's body at the time of the autopsy.[5] She maintained that manipulation of the body during recovery and transportation resulted in mechanical breakage of rigor in the conspicuous regions of the body. Thus, Peerwani found no obvious rigor in the body and likely failed to examine it more closely.

Further, Norton opined that finding Williams's body nude was unexceptional. Norton concluded that the body, having washed downstream through debris, tree branches, and rocks, could have been partially or fully clothed when it entered the water and yet been recovered completely nude. Norton dismissed the curvilinear scratches on Williams's neck and the hemorrhaging of the strap muscles of the neck as probably caused by Williams's body striking limbs or debris in the creek. Further, she testified that the pinpoint hemorrhages found on the eyes are not unique to victims of strangulation; rather, they are common in all types of death resulting from simple heart failure.

4. Chemical tracheitis is produced when food is aspirated into the lungs. The food becomes mixed with stomach acid, causing a chemical reaction in the lining of the trachea.

5. In the morgue photographs, Williams's mouth is pictured in a closed position. According to

Norton, when rigor fades entirely, the jaw becomes slack and the mouth hangs open. Norton based her conclusion that there was rigor at the time of the autopsy principally on the position of Williams's mouth in the photographs.

Norton asserted that the absence of frothy fluid or edema in Williams's lung tissue was unremarkable because no such edema appears in approximately 25 percent of drowning victims.

Turro contends that Peerwani discredited his own autopsy findings. Turro directs us to Peerwani's concession that he erroneously concluded that Williams's body was free of rigor when he first examined it at the morgue. After closer inspection of the autopsy photographs, Peerwani agreed with Norton that those pictures, taken the day after the body was discovered, show the presence of rigor in some joints. Thus, Turro argues that Peerwani's estimate of the time of Williams's death is no longer reliable because he based it on his erroneous observations of rigor.

In support of the State's theory that Turro murdered Williams, the key evidence was Peerwani's expert testimony. Peerwani predicated his conclusion that Williams was murdered by manual strangulation before entering the water on the following evidence:

1. Williams was purportedly clothed when she went into the water, but her body was nude when found.
2. There were curvilinear abrasions on the left side of Williams's neck.
3. There were pinpoint hemorrhages in the covers of her eyeballs and in the inner linings of her eyelids.
4. There was hemorrhaging in the deep strap muscles of her neck.
5. There was no frothy edema in the trachea or the bronchioles, but food had been aspirated into the tracheobronchial tree.
6. Rigor had passed, or nearly passed, from Williams's body by the time of the autopsy.

In further support of the State's theory, Peerwani testified that Williams was in the early stages of pregnancy. Additionally, Williams's sister, Kathy Hysaw, testified that Williams and Turro had dated and lived together. However, Williams had recently moved from Turro's home to Hysaw's and was looking for her own apartment. Hysaw further testified that she had heard Turro threaten to kill Williams in a telephone conversation that she had overheard a few days before the murder. The State also offered evidence indicating that when Turro was overtaken by the flashflood, he was travelling a route leading toward a dump area, putting forth the theory that he was on his way to dump Williams's body. The State contends that these circumstances, combined with Peerwani's opinion, plainly point to the conclusion that Turro is guilty of murdering Williams.

Every circumstantial evidence case, under the standard set forth above, must be tested by its facts to determine whether the evidence legally supports the conviction. *See Earnhart v. State,* 575 S.W.2d 551, 554 (Tex. Crim.App. [Panel Op.] 1979). Although Peerwani conceded that his opinions about the time and cause of death were not absolute and that he could not entirely eliminate the possibility that Williams died from accidental drowning, proof beyond a reasonable doubt need not be proof beyond all doubt. *See Crocker v. State,* 573 S.W.2d 190, 207 (Tex.Crim.App. [Panel Op.] 1978). In a circumstantial evidence case, such as this one, it is unnecessary for the circumstances to exclude, to a moral certainty, every other feasible hypothesis. *See Carlsen v. State,* 654 S.W.2d 444, 447 (Tex.Crim.App.1983). The evidence presented here was as consistent with one theory as with the other. We can infer from the jury's guilty verdict that the jury chose to believe Peerwani's conclusion of manual strangulation, and to reject any or all contradictory evidence. *See Adelman v. State,* 828 S.W.2d 418, 421 (Tex.Crim.App. 1992).

After reviewing all the evidence in the light most favorable to the verdict, we find the combined and cumulative circumstances lead us to conclude there was legally sufficient evidence for that choice to be a reasonable one. A rational trier of fact could conclude beyond a reasonable doubt that Turro was guilty, and exclude every other reasonable hypothesis except for his guilt. *See Russell,* 665 S.W.2d at 776; *Carlsen,* 654 S.W.2d at 447. Consequently, we hold that the circumstantial evidence that the State presented is legally sufficient to exclude ev-

ery reasonable hypothesis except Turro's guilt.

### Factual Sufficiency of the Evidence

Since this case was first submitted on appeal, the Texas Court of Criminal Appeals held that factual sufficiency review is available in all criminal cases. *See Clewis v. State,* 922 S.W.2d 126, 128–29 (Tex.Crim.App. 1996). Although that court did not indicate whether we were to give its holding in *Clewis* retroactive effect, this court applied it in pending cases submitted before January 31, 1996, provided the appellant asserted a sufficiency complaint under the *Jackson* standard and we could reasonably construe that complaint as raising a factual sufficiency challenge as well. *See, e.g., Kerr v. State,* 921 S.W.2d 498, 500 (Tex.App.—Fort Worth 1996, no pet.); *see also Clewis,* 922 S.W.2d at 133. Moreover, in his dissent from the Texas Court of Criminal Appeals's opinion in the second remand of this case, Judge Clinton urges that we review the factual sufficiency of the evidence in this case. *See Turro,* No. 964–95, slip op. at 2 (Clinton, J., dissenting). In light of Judge Clinton's recommendation, the fact that *Clewis* was undecided at the time this case was appealed, and the particular facts and circumstances of this case, we conclude that justice requires that we perform a factual sufficiency review to ensure that we avoid any manifest injustice.

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view "all the evidence without the prism of 'in the light most favorable to the prosecution.'" *Clewis,* 922 S.W.2d at 129 (citing *Stone v. State,* 823 S.W.2d 375, 381 (Tex.App.—Austin 1992, pet. ref'd, untimely filed)). We may only set aside the verdict if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See id.*

We cannot say under the standard as set forth in *Clewis,* that the evidence is factually insufficient to support the judgment. The State provided a significant quantity of circumstantial evidence that Turro murdered Williams. Peerwani testified that it was his opinion that Williams was murdered by manual strangulation because

her body was nude when found, there were curvilinear abrasions on the left side of her neck, there were pinpoint hemorrhages in the covers of her eyeballs and in the inner linings of her eyelids, there was hemorrhaging in the deep strap muscles of her neck, there was no frothy edema in the trachea or the bronchioles, even though food had been aspirated into her tracheobronchial tree, and rigor had passed, or nearly passed, from Williams's body by the time of the autopsy. Despite the fact that his testimony about his findings regarding the rigor in Williams's body was significantly impeached, and in part recanted, there stands a significant quantity of testimony supporting his opinion, and we cannot say that a jury's election to believe it is against the great weight and preponderance of the evidence. Additionally, the State provided evidence that Williams was in the early stages of pregnancy, that Turro had threatened to kill Williams a few days before the murder, and that Turro was traveling a route leading toward a dump area when he drove into the flashflood. Thus, we cannot hold that this verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

Accordingly, we hold the evidence is both legally and factually sufficient to support the judgment, and we overrule points of error one and two.

Turro has raised nine additional points on appeal. However, because of our previous dispositions of the case, we have not considered these remaining points. We now turn, for the first time, to Turro's remaining points of error.

### EVIDENTIARY RULINGS

In seven points of error, Turro complains of evidentiary rulings by the trial court. He argues that the trial court ruled improperly regarding bolstering, impeachment, hearsay, opinion testimony, witnesses' drawing conclusions, and a witness referring to Williams as "complainant." As an appellate court, we review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *See Green v. State,* 934 S.W.2d 92, 102 (Tex.Crim.App.1996), *cert. de-*

nied, —— U.S. ——, 117 S.Ct. 1561, 137 L.Ed.2d 707 (1997). Such issues are largely dependent on the individual judge's perception of common experience, and reasonable persons may often disagree. *See Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim. App.1990) (op. on reh'g). Thus, reviewing courts should hesitate to substitute their own perceptions for those of the trial judge. *See id.* Therefore, provided a trial court ruling is "at least within the zone of reasonable disagreement, the appellate court will not intercede." *Id.* In arguing these points of error, Turro grouped them by witness. Thus, we will address them similarly.

### Peerwani's Testimony

In point of error three, Turro argues that the trial court erred by permitting Peerwani to make a "line-by-line" analysis of Turro's written statement, bolstering his own testimony and impeaching Turro, who did not testify.

Turro made a voluntary pretrial statement to police, stating his version of the events that occurred when the car was swept into the flashflood. The State introduced this statement into evidence. After Peerwani testified regarding the autopsy findings and his opinions on Williams's death, the State asked him to review Turro's statement and give his opinion regarding whether it was consistent or inconsistent with his autopsy findings. Peerwani pointed out several instances where, in his opinion, Turro's statement was inconsistent with Peerwani's opinions. Most notably, he indicated that Turro stated that Williams was alive, struggling, and screaming when the car went into the water, but she had no water in her trachea. In Peerwani's opinion, if she could scream and struggle after entering the water, she could pass air through her larynx; thus, she would have aspirated water.

Turro's argument regarding this point of error is multifarious. However, because we can identify and understand most of his claims, justice requires that we address them. *See Armstrong v. State*, 845 S.W.2d 909, 910 (Tex.Crim.App.1993). *But see Thomas v. State*, 723 S.W.2d 696, 697 n. 2 (Tex.Crim.App.1986). Turro argues that:

1. Peerwani provided an impermissible expert opinion on Turro's credibility;

2. Peerwani improperly bolstered his own testimony;

3. the State failed to disprove the statement beyond a reasonable doubt;

4. the State placed Turro's statement in evidence solely for the purpose of using it to impeach Turro and having offered it in evidence, the State should have been estopped to dispute it; and

5. the State should not be permitted to impeach Turro, who rightfully chose not to testify, because such impeachment was effectively a comment on his failure to testify.

 Expert testimony is admissible if it helps the factfinder understand the evidence or determine a fact in issue. *See* Tex.R.Crim. Evid. 702; *Williams v. State*, 895 S.W.2d 363, 366 (Tex.Crim.App.1994). But it must be "limited to situations in which the expert's knowledge and experience on a relevant issue are beyond that of an average juror." *Duckett v. State*, 797 S.W.2d 906, 914 (Tex.Crim.App.1990), *overruled on other grounds, Cohn v. State*, 849 S.W.2d 817, 819 (Tex.Crim.App.1993). An expert is not permitted to give a direct opinion on the truthfulness of a witness because this is not a subject on which an expert's testimony would assist a factfinder. *See Yount v. State*, 872 S.W.2d 706, 710 (Tex.Crim.App.1993). However, expert testimony, by nature, may tend to show whether another is telling the truth. This alone will not render that testimony inadmissible. *See Duckett*, 797 S.W.2d at 914.

 In the present case, Peerwani applied the expertise he gained from performing Williams's autopsy to Turro's statement and gave his opinion regarding whether the assertions in Turro's statement were consistent or inconsistent with Peerwani's opinion. Peerwani did not address whether he believed Turro's statement was credible; he addressed whether it was consistent with his opinion. If believed, Peerwani's testimony would assist the lay jurors in understanding that Turro's statement that Williams was screaming and struggling in the water was

**400** ▪ ▬▬▬▬▬▬▬▬▬▬▬▬

inconsistent with Peerwani's finding that she had aspirated no water. It was within the trial court's discretion to find that this testimony was not an improper expert's direct opinion on a witness's credibility.

■ Turro further argues that this testimony was improper bolstering of Peerwani's own testimony. The Court of Criminal Appeals has refined its definition of bolstering:

> "Bolstering" may perhaps be understood a little more precisely to be any evidence the sole purpose of which is to convince the factfinder that a particular witness or source of evidence is worthy of credit, without substantively contributing "to make the existence of [a] fact that is of consequence to the determination of the action more or less probable than it would be without the evidence."

*Cohn,* 849 S.W.2d at 819–20 (citing TEX. R.CRIM. EVID. 401); *see also Wigiert v. State,* 948 S.W.2d 54, 59 (Tex.App.—Fort Worth 1997, n. pet. h.); *Solomon v. State,* 854 S.W.2d 265, 269 (Tex.App.—Fort Worth 1993, no pet.). Accordingly, if the evidence makes any substantive contribution, even if it only incrementally tends to further establish a fact of consequence, it is not bolstering.[6] *See Cohn,* 849 S.W.2d at 819–20; *Wigiert,* 948 S.W.2d at 59.

■ We cannot say that Peerwani's testimony did not at least incrementally tend to further establish facts of consequence, i.e., that if Williams could scream, she probably would have aspirated water and that none of the facts alleged in Turro's statement would account for the deep hemorrhages Peerwani discovered in Williams's neck. *See Cohn,* 849 S.W.2d at 819–20. We hold that the trial

court did not abuse its discretion by determining that Peerwani's testimony regarding Turro's statement was more than simple bolstering of Peerwani's own testimony.

■ Turro further challenges this testimony by asserting that the State introduced Turro's statement into evidence, but failed to disprove it beyond a reasonable doubt. This argument is essentially a precise statement of the "voucher rule." *See Palafox v. State,* 608 S.W.2d 177, 181 (Tex.Crim.App.1979). This rule was superseded in 1986 by the adoption of the Texas Rules of Criminal Evidence. *See Russeau v. State,* 785 S.W.2d 387, 390 (Tex.Crim.App.1990). The State need no longer disprove a defendant's exculpatory statement that it introduces into evidence. *See id.*

■ Turro next argues that because the State placed Turro's statement in evidence, the State should have been "estopped" to dispute it because it offered it solely for the purpose of impeaching Turro. The State offered this statement in evidence without a stated purpose or limiting instruction and Turro raised no objections to its admission. A party opposing evidence has the burden of objecting and requesting any limiting instruction at the introduction of the evidence. *See Garcia v. State,* 887 S.W.2d 862, 878 (Tex.Crim.App.1994), *cert. denied,* 514 U.S. 1021, 115 S.Ct. 1368, 131 L.Ed.2d 223 (1995); *Abdnor v. State,* 808 S.W.2d 476, 478 (Tex. Crim.App.1991); *see also* TEX.R.CRIM. EVID. 105; TEX.R.APP. P. 52(a). Once evidence is received without a proper limiting instruction, it becomes part of the general evidence in the case and may be used as proof to the full extent of its rational persuasive power.

6. In fact, there is some question regarding whether objecting to offered evidence as "bolstering" remains sufficiently specific to properly preserve error:

Prior to the adoption of the Rules of Evidence, "bolstering" was a proper objection when one item of evidence was used by a party to add credence or weight to some earlier unimpeached evidence that the same party had offered. Under case law existing prior to the promulgation of the Rules of Evidence, bolstering an unimpeached witness was "automatically" error. The Rules of Evidence, however, do not contain a specific rule pertaining to or prohibiting "bolstering." Moreover, nothing in the Rules prevents a party from

adding credence to an unimpeached witness or adding credence to other evidence as long as that additional evidence is relevant. In fact, the Rules favor admissibility. Therefore, if such "bolstering" evidence is presented, the party seeking exclusion must object in accord with the Rules of Evidence so as to inform the trial court that the evidence is not relevant (Rule 402), the evidence is substantially prejudicial, confusing, needlessly cumulative (Rule 403), or otherwise specify a rule or reason found in the Rules to exclude the evidence.
*Cohn,* 849 S.W.2d at 821 (Campbell, J., concurring) (citations omitted).

*See Garcia,* 887 S.W.2d at 878. Accordingly, Turro's statement was admitted for all purposes. We find no rule of law that prohibits the State from using Turro's statement to develop Peerwani's expert testimony. We have already held that Peerwani did not offer any testimony regarding the credibility of Turro, but only testified as to whether Turro's statement seemed consistent with Peerwani's opinion.

 Finally, Turro contends that the trial court should not have permitted the State to impeach Turro, who rightfully chose not to testify, because such impeachment was effectively a comment, by innuendo, on Turro's failure to testify. Although Turro cites authority for a defendant's right to choose not to testify, he fails to refer us to the pages in the record that show any error was properly preserved. Moreover, he fails to point us to any remark or comment by the State that he contends is an innuendo regarding his failure to testify. Accordingly, we dismiss this argument as inadequately briefed. *See* Tex. R.App. P. 74(f); *Lawton v. State,* 913 S.W.2d 542, 554 (Tex.Crim.App.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 88, 136 L.Ed.2d 44 (1996); *Foster v. State,* 779 S.W.2d 845, 864 (Tex.Crim.App.1989), *cert. denied,* 494 U.S. 1039, 110 S.Ct. 1505, 108 L.Ed.2d 639 (1990).

We hold that the trial court acted within the scope of its discretion when it permitted Peerwani to testify regarding whether Turro's statement was consistent with Peerwani's opinion. Accordingly, we overrule point of error three

### Hysaw's Testimony

In his fourth through seventh points of error, Turro challenges various trial court rulings regarding Hysaw's testimony. He argues in point of error four that her testimony regarding listening to a telephone conversation between Williams and someone named "Julie," in part overhearing only what Williams said and in part by eavesdropping on an extension telephone, was inadmissible as hearsay and "conclusions." In his fifth point of error, he maintains that Hysaw's testimony regarding her thoughts and conclusions about Williams while eavesdropping on the telephone extension to the ensuing telephone conversation between Williams and Turro was also inadmissible as testimony of Hysaw's opinions and conclusions. Next, he argues that Hysaw's testimony about telling her family members about Turro's alleged threats to Williams was both inadmissible hearsay and bolstering. Finally, he contends it was reversible error when Hysaw testified that Williams feared Turro as much as Hysaw did despite the trial court's sustaining the objection and promptly instructing to the jury to disregard.

Points of error four and five are concerned with the same telephone call. Hysaw testified that while Williams was living with her, Williams received a phone call from someone named Julie, who was another of Turro's girlfriends. Hysaw stated that from what she could hear, Williams was angry. Hysaw then picked up an extension telephone in another room and eavesdropped on a conversation between Williams and Julie and an ensuing conversation between Williams and Turro. She recognized both Julie's and Turro's voices. She testified that Turro told Williams he wanted to come over and pick her up, but Williams told him "if he was going to be with Julie, that it was either going to be Julie or her." Then, she stated that Turro responded that if "it's no more me and you," then he would kill Williams.

Turro's fourth point of error addresses only the testimony regarding the conversation between Julie and Williams. He argues that Hysaw's testimony regarding the overheard conversation between Williams and Julie was inadmissible because it was both hearsay and conclusory. We will first address his contentions of hearsay. During Hysaw's testimony regarding this conversation, the only instance of hearsay that we find is in the following exchange:

[STATE'S ATTORNEY:] What was her reaction when she picked up the telephone? What did she say?

[HYSAW:] *She wanted to know why that person called her sister's house.*

[STATE'S ATTORNEY:] Did she call that person by name?

[HYSAW:] Yes.

[DEFENSE ATTORNEY]: Your Honor, we're going to object to this if it's a conversation on the telephone with someone other than this Defendant.

. . . .

[DEFENSE ATTORNEY]: On the grounds that it would be hearsay.

[Emphasis added.]

The State then informed the court that it did not intend to offer the contents of the telephone conversation, and the trial court overruled Turro's hearsay objection. The State never asked again, and Hysaw never testified again, regarding the contents of Williams's conversation with Julie. Hysaw only stated that Julie was a party to the conversation. It is evident in the record that the witness was testifying from personal knowledge that she "heard Julie's voice" on the telephone.

■ Regarding any error regarding Hysaw's testimony that "[s]he wanted to know why that person called her sister's house," Turro preserved no error for appeal regarding this testimony because his objection was untimely. The Texas Rules of Appellate Procedure provide that "to preserve a complaint for appellate review, a party must have presented to the trial court a *timely* request, objection or motion." TEX.R.APP. P. 52(a) (emphasis added). To be timely, an objection must be raised at the earliest opportunity or as soon as the ground of objection becomes apparent. *See Penry v. State*, 903 S.W.2d 715, 763 (Tex.Crim.App.), *cert. denied*, — U.S. ——, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995). The State's attorney plainly asked for hearsay when the State asked, "What did she say." Yet, Hysaw answered *and another question was asked and answered before Turro raised a hearsay objection.* Accordingly, any error regarding this hearsay testimony is waived.

■ Turro also objected that some of Hysaw's testimony regarding this conversation was inadmissible as calling for conclusions from Hysaw:

[STATE'S ATTORNEY:] What was the emotional tenor of the conversation that [Williams] was having with Julie on the telephone?

[DEFENSE ATTORNEY]: Your Honor, we would object to the question about the emotional tenor because it's . . . asking for some conclusion of this witness as to some other person's state of mind or emotion. . . .

THE COURT: Overrule the objection.

[STATE'S ATTORNEY:] Ms. Hysaw, was [Williams] happy to be talking to Julie?

[HYSAW:] No.

[DEFENSE ATTORNEY]: Your Honor, we'd object to that as asking for a conclusion about some other person's state of mind or emotion. It could only be a conclusion on the part of this witness. It's inadmissible.

THE COURT: Overruled.

[STATE'S ATTORNEY:] Was Carolyn angry during this conversation?

[HYSAW:] Yes.

[DEFENSE ATTORNEY]: We would object to that for the same reason, Your Honor.

THE COURT: Overruled.

This complaint is similar to that raised in the next point of error about Hysaw's testimony regarding the overheard conversation between Williams and Turro. There, Turro contends that Hysaw's testimony regarding her thoughts and conclusions about Williams during the conversation between Williams and Turro was inadmissible because it was testimony of Hysaw's opinions and conclusions. The testimony complained of is as follows:

[STATE'S ATTORNEY:] What kind of ultimatum did she give Mr. Turro?

[HYSAW:] That if he was going to be with Julie, that it was either going to be Julie or her.

[STATE'S ATTORNEY:] And you understand that as [Williams] telling him he had to choose?

[DEFENSE ATTORNEY]: Your Honor, we object to what this witness understood. It's asking for a conclusion on the witness'[s] part about somebody else's intent.

THE COURT: Overrule the objection.

[STATE'S ATTORNEY:] When [Williams] gave him the ultimatum, "Choose me or choose Julie," what did Domingo say?

[HYSAW:] He proceeded to tell her he was coming over and that she couldn't tell him "No, that it was going to be no more me and you," is what he was saying; that he would kill her if it's "no more me and you."

[STATE'S ATTORNEY:] What did you think when you heard that?

[DEFENSE ATTORNEY]: We object to what she thought as a conclusion on her part, Your Honor. She wasn't even a party to the conversation.

THE COURT: Overrule the objection.

We construe Turro's objection that this testimony calls for "conclusions" or "opinions and conclusions" from the witness to be that such testimony must necessarily be based on speculation and conjecture on her part. Accordingly, such testimony would not be based on her personal knowledge and she would be incompetent to testify about such matters under rule 602. *See* TEX.R.CRIM. EVID. 602. Further, testimony based solely on speculation and conjecture would lack probative value; thus, it would not be relevant. *See* TEX.R.CRIM. EVID. 401. Accordingly, it would be inadmissible under rule 402. *See* TEX. R.CRIM. EVID. 402. However, testimony such as the foregoing need not be based solely on conjecture and speculation. Lay witness opinion testimony is admissible if it is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of [the] testimony or the determination of a fact in issue." TEX.R.CRIM. EVID. 701; *see Bigby v. State*, 892 S.W.2d 864, 888 (Tex. Crim.App.1994), *cert. denied*, 515 U.S. 1162, 115 S.Ct. 2617, 132 L.Ed.2d 860 (1995). Rule 701's requirement that the testimony be based on the witness's perception presumes the witness observed or experienced the underlying facts, thus meeting the personal-knowledge requirement of rule 602. *See Bigby*, 892 S.W.2d at 889.

Hysaw was personally listening to these conversations. She was able to perceive the inflections in both Williams's and Turro's voices. Williams was her sister and Turro

was well-known to Hysaw. She would have sufficient firsthand familiarity with both individuals to place a reasonable interpretation on these inflections. *See Jackson v. State*, 822 S.W.2d 18, 31 (Tex.Crim.App.1990), *cert. denied*, 509 U.S. 921, 113 S.Ct. 3034, 125 L.Ed.2d 722 (1993). It would be within the trial court's discretion to determine that her opinions as to the emotional undercurrents of the telephone conversations were rationally based on her hearing perception. Moreover, as the testimony was a predicate to her testimony of Turro's threats on Williams's life, these opinions were helpful to the jury's understanding of Hysaw's testimony and material to its subsequent determination of Turro's guilt. We hold that admitting this testimony was within the trial court's discretion. Accordingly, we overrule points of error four and five.

In point of error six, Turro complains that Hysaw's testimony about telling her family members about Turro's alleged threats to Williams was both inadmissible hearsay and bolstering. During redirect examination of Hysaw, the following exchange occurred:

[STATE'S ATTORNEY:] Let's talk a little bit about the telephone conversation you overheard.

Did you tell other members of your family about that conversation and what you had overheard?

[HYSAW:] I told my husband.

[DEFENSE ATTORNEY]: Well, Your Honor, we would object to what she told other members of her family as hearsay.

THE COURT: Overruled.

. . . .

[STATE'S ATTORNEY:] Did you tell other members of your family about that threat?

[DEFENSE ATTORNEY]: We further object to that on the grounds of repetition, Your Honor, and for the reason previously objected.

THE COURT: Overruled.

[HYSAW]: Yes.

Turro objected to this testimony as hearsay and as "repetition." On appeal he argues

that the testimony is hearsay and bolstering. When the complaint on appeal differs from that made at trial, the error is waived. *See Cook v. State*, 858 S.W.2d 467, 474 (Tex.Crim. App.1993). The trial judge did not have an opportunity to rule on that legal theory, and the State did not have an opportunity to offer evidence and argue against it. *See id.; Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim.App.1992); *Purtell v. State*, 761 S.W.2d 360, 365–66 (Tex.Crim.App.1988), *cert. denied*, 490 U.S. 1059, 109 S.Ct. 1972, 104 L.Ed.2d 441 (1989); *Zillender v. State*, 557 S.W.2d 515, 517 (Tex.Crim.App.1977). Thus, Turro has waived any argument that this testimony is bolstering.

■ However, Turro has properly preserved his hearsay objection for review. We hold this testimony is not hearsay under rules 612(c) and 801(e)(1)(B). *See* Tex R.Crim. Evid. 612(c), 801(e)(1)(B). Rule 612 provides that a prior consistent statement of a witness is "inadmissible except as provided in 801(e)(1)(B)." Tex.R.Crim. Evid. 612(c). Under rule 801(e)(1)(B), a statement is not hearsay if:

> The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive....

Tex.R.Crim. Evid. 801(e)(1)(B). This permits admission of a prior consistent statement to rebut allegations of improper influence or motive. *See Moody v. State*, 827 S.W.2d 875, 893 (Tex.Crim.App.), *cert. denied*, 506 U.S. 839, 113 S.Ct. 119, 121 L.Ed.2d 75 (1992); *Haughton v. State*, 805 S.W.2d 405, 408 (Tex. Crim.App.1990). The *prior statement must relate to the same matter or incident* testified to by the declarant at trial and must have been made before the alleged improper motive arose. *See id.; Kipp v. State*, 876 S.W.2d 330, 338 (Tex.Crim.App.1994).

In the present case, the following exchange occurred during the defense attorney's cross-examination of Hysaw.

[DEFENSE ATTORNEY:] ... [A]re those two statements what you're talking about as the threats that you hadn't told anybody about before?

[HYSAW:] I considered that a threat, yes.

[DEFENSE ATTORNEY:] All right. But the first time you ever told any of the official people, either the prosecuting attorneys in this case or the detective or other police officials, about that threat was on May the 17th, 1989, at a prior proceeding in this case, wasn't it?

[HYSAW:] Yes.

[DEFENSE ATTORNEY:] And that was more than two years after your sister's death, wasn't it?

[HYSAW:] Yes.

[DEFENSE ATTORNEY:] So you had not communicated this claim of any threats by [Turro] to either the prosecuting attorneys or the police—investigating police before that day?

[HYSAW:] Not before that day, no.

....

[DEFENSE ATTORNEY:] But they never discussed with you what your testimony might be about?

[HYSAW:] Not when I called them, no.

[DEFENSE ATTORNEY:] And how many times did you talk with either Mr. Dickson or Mr. McEntire or anybody else from the District Attorney's Office during that two-year period?

[HYSAW:] Maybe four times.

[DEFENSE ATTORNEY:] Then what about Mr. Don Stewart, the District Attorney's Office investigator? How many times did you talk to him?

[HYSAW:] During the two-year period?

[DEFENSE ATTORNEY:] Yes.

[HYSAW:] Maybe twice.

[DEFENSE ATTORNEY:] But in any of those contacts with those officials, you never mentioned any threat by [Turro] towards your sister, did you?

[HYSAW:] No.

[DEFENSE ATTORNEY:] And even two years later on May 17th, 1989, you only did it after Mr. McEntire said, "Kathy, did you ever hear any threats by [Turro] towards your sister?"

[HYSAW:] No, sir.

[DEFENSE ATTORNEY:] Isn't that what he asked you when you first disclosed a claimed recollection about a threat?

[HYSAW:] I don't remember him using that terminology, no.

It would be within the trial court's discretion to determine that the defense was attempting to create the inference that Hysaw had fabricated the conversation some two years after the murder when she was influenced by a prosecutor's question in the prior proceeding. Thus, on redirect examination, when the State questioned her regarding whether she had reported the threats to any family members, it would be to counter this inference of recent fabrication. Accordingly, it would be within the trial court's discretion to determine that Hysaw's prior consistent statement—that she told her husband and other family members about Turro's threat to kill Williams—was admissible nonhearsay. Thus, we overrule point of error six.

■ In his seventh point of error, Turro maintains that it was reversible error when Hysaw testified that Williams feared Turro as much as Hysaw did despite the trial court's prompt instruction to the jury to disregard. Hysaw testified that it was her opinion that Williams left Turro because she feared him. Turro objected the she was testifying to the deceased's state of mind and requested an instruction to disregard. The trial court sustained Turro's objection and instructed the jury to disregard the statement. Turro did not move for a mistrial.

To preserve a complaint for our review, an objecting party must pursue an objection to an adverse ruling. If the objection is sustained, the objecting party must request an instruction to disregard. If the instruction is given, the party must move for a mistrial. *See Brooks v. State,* 642 S.W.2d 791, 798 (Tex.Crim.App. [Panel Op.] 1982). In the present case, the trial court sustained Turro's objection and gave his requested instruction. He did not move for a mistrial. The trial court provided him all the relief he requested and nothing is preserved for our review. We overrule Turro's seventh point of error.

*Flores's Testimony*

■ Several police officers and firefighters were called as witnesses throughout the trial. Officer Joseph Flores was called by the State as a crime scene investigator dispatched on the discovery of Williams's body. He testified regarding the scene of the discovery of the body and the location and condition of the body. He also verified the accuracy of several photographs of the scene that were admitted as evidence. Turro complains of Flores's testimony in two points of error. In point of error eight, Turro complains of the trial court overruling his objection to Flores's referring to Williams as the "complainant" throughout his testimony. In point of error nine, he argues that the trial court erred by permitting Flores to testify that he had never seen a drowning where a person reportedly clothed when entering the water was nude when found.

Turro argues that Williams could not be a "complainant" because she was deceased and that permitting Flores to refer to Williams as "complainant" raised a prejudicial inference that she was "crying for vengeance from her grave." He points out to us that Flores referred to Williams as the "complainant" 15 times during his testimony. Flores explained to the jury that he used the term "complainant" simply out of habit because it was the term police officers commonly used to refer to all victims. He further explained that he was not attempting to imply that the deceased was not an accident victim.

As authority, Turro relies solely on the Eastland Court of Appeals's holding in *Talkington v. State,* 682 S.W.2d 674, 675 (Tex. App.—Eastland 1984, pet. ref'd). However, that holding is inapplicable and we find no other case on point. In *Talkington,* a rape conviction where consent was at issue, was reversed because the trial court used the term "victim" in the jury charge. The court held this to be an improper comment on the weight of evidence. *See id.* Here, we are not addressing a trial court intruding on the province of the jury by commenting on the weight of the evidence, but a term used by witness while testifying.

We acknowledge that the term "complainant" refers to a person applying to the courts for legal redress by filing a complaint or a person instigating prosecution or accusing a suspected person. *See* BLACK'S LAW DICTIONARY 285 (6th ed.1990). This definition naturally raises the implication that such a person must be alive to complain. But this definition would not naturally raise a negative implication in the mind of an ordinary person. Moreover, it is not only the habit of police officers to refer to deceased victims as complainants, it is often used in that manner by courts. *See, e.g., Cook v. State,* 940 S.W.2d 623, 624 (Tex.Crim.App.1996); *McDuff v. State,* 939 S.W.2d 607, 611 (Tex. Crim.App.1997); *Soria v. State,* 933 S.W.2d 46, 69 (Tex.Crim.App.1996) (Mansfield, J., concurring), *cert. denied,* —— U.S. ——, 117 S.Ct. 2414, 138 L.Ed.2d 179 (1997). We hold that it was within the zone of the trial court's discretion, particularly in light of Flores's explanation, to determine that use of this term to refer to a deceased victim would not naturally raise a negative implication in the mind of a reasonable juror. We overrule point of error eight.

■ Next, Turro complains of the trial court's permitting Flores to testify that he had never seen a drowning where a person who was clothed when entering the water was nude when found. Turro complains of the following testimony:

> [STATE'S ATTORNEY:] Officer Flores, have you ever seen a body that was completely nude that had been clothed at the time it entered the water?
> [FLORES:] No, sir, I have not.

Turro argues that this testimony was inadmissible under rule 701 because that rule "expressly" excludes opinions not made by expert witnesses in the area of their expertise. Flores was not asked and did not offer an opinion regarding whether it was reasonable or common to discover a body that was completely nude when it had been clothed at the time it entered the water. He was simply asked whether, in his experience, he had seen one. Turro does not argue on appeal that the evidence was irrelevant and inadmissible under rules 401 and 402. He only argues it was inadmissible opinion testimony.

It was within the trial court's discretion to determine this was not opinion testimony. We overrule point of error nine.

## DENIAL OF CHALLENGE FOR CAUSE

■ *Turro complains, in point of error ten, that the trial court erred during voir dire by denying his challenge for cause of prospective juror number 32.* Turro has not properly preserved this point for appeal. To preserve a challenge for cause error, a defendant must exhaust his peremptory challenges, request additional peremptory challenges, identify a member of the jury as objectionable, and claim that he would have struck the juror with a peremptory challenge. *See Broussard v. State,* 910 S.W.2d 952, 956–57 (Tex.Crim.App.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 87, 136 L.Ed.2d 44 (1996); *Nelson v. State,* 848 S.W.2d 126, 134 (Tex.Crim.App.1992), *cert. denied,* 510 U.S. 830, 114 S.Ct. 100, 126 L.Ed.2d 66 (1993); *Harris v. State,* 790 S.W.2d 568, 581 (Tex.Crim.App.1989).

■ In the present case, Turro contends that he exhausted his peremptory challenges and "the trial court did not award any additional strikes." But the record does not indicate that Turro requested any additional peremptory challenges. Moreover, it does not reflect that he informed the trial court that he was being compelled to go to trial with an objectionable juror. Accordingly, we overrule point of error ten.

## NOTICE OF DEADLY WEAPON FINDING

■ Finally, Turro argues that the trial court erred by making an affirmative finding of use of a deadly weapon because the State had not provided sufficient notice to him that it would seek such a finding. He contends there was no proof that his hands were used as deadly weapons and that use of a deadly weapon was not mentioned in any of the evidence offered. Because the indictment provided sufficient notice to Turro that the State was contending that his hands were used as deadly weapons, we disagree.

Turro contends the indictment did not notify him of the State's intent to seek a finding on use of a deadly weapon because it did not

charge that a weapon named in section 1.07(a) of the Texas Penal Code caused the death or that a named instrument, in the manner of its use, was capable of causing or did cause the death. Section 1.07 provides that "deadly weapon" means:

(A) a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or

(B) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

TEX. PENAL CODE ANN. § 1.07(a)(17) (Vernon 1994).[7]

An allegation in an indictment that a named weapon or instrument caused death or serious bodily injury "necessarily includes an allegation that the named weapon or instrument was, 'in the manner of its use ... capable of causing' (since it *did* cause) death." *Ex parte Beck*, 769 S.W.2d 525, 526 (Tex.Crim.App.1989); *see also Johnson v. State*, 815 S.W.2d 707, 709 (Tex.Crim.App. 1991); *Hocutt v. State*, 927 S.W.2d 201, 204 (Tex.App.—Fort Worth 1996, pet. ref'd). This provides notice that use of a deadly weapon will be an issue in the prosecution. *See Johnson*, 815 S.W.2d at 709; *Speering v. State*, 797 S.W.2d 36, 37 (Tex.Crim.App. 1990); *Hocutt*, 927 S.W.2d at 204.

Turro's indictment alleged that he "intentionally and knowingly cause[d] the death of an individual, Carolyn Williams, by strangling Carolyn Williams with his hands." The allegation in the indictment that he caused Williams's death by strangling her "with his hands" gave notice that the State would attempt to prove his "hands" were used as deadly weapons and that the prosecution would seek an affirmative finding as to Turro's use of these deadly weapons. *See Johnson*, 815 S.W.2d at 709 (death caused by "hands and feet" provides notice); *Mixon v. State*, 804 S.W.2d 107, 108 (Tex.Crim.App. 1991) (death caused by "unknown object" provides notice); *Gilbert v. State*, 769 S.W.2d 535, 537 (Tex.Crim.App.1989) ("serious bodily injury" caused by placing in "hot liquid" provides notice); *Speering*, 797 S.W.2d at 37

("death caused by strangulation and stabbing" provides notice).

Accordingly, the trial court did not err by making an affirmative finding of use of a deadly weapon because the language of Turro's indictment provided him sufficient notice of the State's intention to seek such a finding. We overrule Turro's eleventh point of error.

CONCLUSION

In summary, the circumstantial evidence that the State presented is legally sufficient to exclude every reasonable hypothesis except Turro's guilt, and we cannot say under the standard set forth in *Clewis*, that the verdict was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Thus, we hold the evidence is both legally and factually sufficient to support the verdict. None of the challenged trial court evidentiary rulings exceeded the zone of its discretion. Any trial court error regarding its denial of Turro's challenge for cause of a potential juror was not properly preserved for review. And the indictment provided sufficient notice of the State's intent to seek an affirmative finding of use of a deadly weapon.

Accordingly, we affirm the judgment of the trial court.

---

7. At the time of trial, this provision was found in section 1.07(a)(11) of the Texas Penal Code. There have been no substantive changes. *See* Act of May 23, 1973, 63rd Leg., R.S., ch. 399, § 1, 1973 Tex. Gen. Laws 883, 887.