# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00302-CR

**Mario Gamez, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
## NO. D-1-DC-13-904036, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found Mario Gamez guilty of capital murder. *See* Tex. Penal Code § 19.03. Because the State did not seek the death penalty, the court automatically imposed a sentence of life in prison without the possibility of parole. *See id.* §§ 12.31(a)(2), 19.03(b). Gamez challenges the trial court's refusal to replace his appointed counsel, its admission of certain testimony, and the sufficiency of the evidence to support the conviction. We will affirm the judgment.

## BACKGROUND

It is undisputed that Bernard Gonzales was found lying face down in blood and vomit on 4th Street east of downtown Austin shortly before 2 a.m. on September 8, 2011. Police and medical personnel who responded to a passerby's 911 call testified that Gonzales's breathing was rapid, labored, and gurgling. Travis County Deputy Chief Medical Examiner Dr. Satish Chundru testified that Gonzales suffered a brain injury of a severity typically associated with car wrecks or

falls from great heights, leaving him comatose until his death a few days later. Chundru testified that Gonzales also suffered tears to his aorta near the middle of his chest that were of the type usually associated with car wrecks. Several witnesses testified that Gonzales's face was badly bruised and he had abrasions on his legs. A police officer who responded to the scene testified that Gonzales had a stab wound on the left side of his chest that was inconsistent with the nature of his other injuries. Chundru concluded that Gonzales died of complications from blunt-force trauma, opining that the injuries "seem[ed] consistent with an auto/ped[estrian] accident." A police officer testified that Gonzales had $16 cash and keys to a GMC vehicle. Though hospital tests showed presumptive positive for cocaine use, he was not found with any crack cocaine paraphernalia.

Police soon discovered that Gonzales's truck was missing. The owner of a nearby business testified that a black pickup truck had been parked near his business overnight for several months. Motion-activated security cameras from the business showed two unidentified individuals walking at 1:20 a.m. toward where the truck usually was parked. Three minutes later, a camera showed the truck being driven away. Police put out a bulletin regarding the missing black truck and, two days later, a police officer received a call about a suspicious car that reportedly contained a person connected to the truck. That car was driven by Christopher Shaw, but owned by Norma Chavira. When police stopped the car, Gamez was hiding in the back seat. Police found the missing black truck nearby.

Police learned that Chavira, Shaw, Gamez, and John Salinas lived in a duplex near where the pickup was found. Police found items belonging to Gonzales in the nearby woods

2

and in a trash can. In Gamez's bedroom, police found more of Gonzales's belongings including prescription drugs, documents, and the truck title.

Chavira testified that she first noticed the black pickup truck on the morning of September 8, 2011. She said that Gamez told her that he had bought the truck from a friend, and Gamez's sister testified that he called her, excited to have purchased a vehicle and wanting to know how to change the owner's name on the title. She said that she walked him through how to investigate the history of the car's title.

Chavira's boyfriend, Shaw, testified that Gamez told him that he "jacked" the truck from a man. Shaw said that Gamez reported punching the man and that John Salinas claimed to have stabbed the man. Shaw testified that Gamez said he drove and that John Salinas added that "we ran him over, it was like running over a speed bump." Shaw testified that Gamez threatened him if he told anybody about how Gamez got the truck.

A police officer testified that Gamez first said that he bought the truck from a friend and later said that he traded Gonzales crack cocaine for the truck. (Police officers testified that "crack rentals"—where persons "rent" or buy vehicles in exchange for drugs—occur in the area where Gonzales was found.) The officer testified that Gamez said that Gonzales was not injured when Gamez drove away. The same officer had interviewed Gonzales two days earlier when Gonzales was robbed and hit on the back of the head in the course of a drug deal.

A police officer testified that Sandra Zamora called a police tip line and provided information about the robbery that had not been publicly released. The officer interviewed Zamora in person and wrote a statement memorializing that interview, which Zamora signed. In

3

the statement, Zamora said that Gamez and John Salinas told her that they got the truck as a dope rental in exchange for crack cocaine. She stated that Gamez told her he beat the truck's owner with a chain and that John Salinas stabbed the owner as he fought to keep his belongings. The officer testified Zamora also told him that Gamez said he drove the truck over the man and that they stopped so that John Salinas could ask the man if he was okay. At trial, however, Zamora denied calling a tip line and denied that she said any of these things to police, asserting that she signed the statement without reading it.

Thomas Salinas testified that he, John Salinas (his brother), and Gamez (his stepbrother) were walking to Gamez's home early on September 8, 2011, after an evening of drinking at a friend's house. Thomas Salinas said he stopped to urinate by some buildings near where Gonzales was later discovered. He testified that John Salinas and Gamez continued walking up a hill, then appeared a few minutes later in a pickup truck. Gamez was driving and John Salinas honked the horn, telling him to get in. Thomas Salinas testified that they told him they bought the truck for twenty rocks of crack cocaine and some money.

Law enforcement laboratory analysts testified that hair found under the rear bumper on Gonzales's truck was microscopically similar to Gonzales's hair and that DNA in blood found inside the front bumper of the truck was consistent with DNA in Gonzales's blood.

## DISCUSSION

Gamez raises three types of challenges to the judgment. He contends that the trial court abused its discretion by refusing to dismiss appointed counsel and give him new counsel,

4

that the trial court abused its discretion in admitting certain evidence, and that the evidence admitted was insufficient to prove some elements of the crime.

**The trial court did not abuse its discretion by refusing to dismiss appointed counsel.**

Before trial, Gamez was not satisfied with his counsel who was appointed on October 17, 2011. On January 23, 2013, Gamez filed a motion to remove his counsel. On February 11, 2013, Gamez's attorney filed multiple motions for discovery, for notice of the State's intention to use evidence of extraneous offenses, to suppress evidence,[1] and to limit the State's right to inquire about prior convictions and extraneous conduct. On April 22, 2013, the day before trial, Gamez asserted that he and his appointed counsel had "a really big conflict of interest." He asserted that his attorney had not shown him evidence like the surveillance videos and had not filed a motion for nineteen months. His attorney responded that he had explained to Gamez that the videos were short and did not identify him or show anyone committing the alleged crimes, but that he would show him the video segments. Gamez's attorney said that he had discussed what he considered more inculpatory evidence like potential testimony. He said that the motions Gamez requested were not relevant or even legal motions and that he would not file frivolous motions on his client's behalf. The trial judge denied the motion to change attorneys, stating that he had presided over proceedings involving Gamez's lawyer and that he considered him "an excellent attorney."

---

[1] These motions were actually filed and ruled on in a different trial court cause (No. D-1-DC-11-302180), but the trial court in this cause "adopted" the motions and rulings in that cause after Gamez was reindicted in this cause.

A defendant with appointed counsel is entitled to representation consistent with the constitution and statutes. *See* U.S. Const. amends. VI, XIV; Tex. Code Crim. Proc. art. 26.04. The defendant carries the burden of proving that he is entitled to a change of counsel. *Hill v. State*, 686 S.W.2d 184, 187 (Tex. Crim. App. 1985). Personality conflicts and disagreements concerning trial strategy are typically not valid grounds for withdrawal. *King v. State*, 29 S.W.3d 556, 566 (Tex. Crim. App. 2000). A trial court has no duty to search for counsel agreeable to the defendant. *Id.* The Sixth Amendment guarantees the right to reasonably effective assistance of counsel, which includes the right to "conflict-free" representation. *See Cuyler v. Sullivan*, 446 U.S. 335, 348-50 (1980). In the case of a conflict of interest, trial counsel renders ineffective assistance if the defendant can demonstrate (1) that trial counsel was burdened by an actual conflict of interest and (2) that the conflict actually affected the adequacy of counsel's representation. *Cuyler*, 446 U.S. at 349-50. An "actual" conflict of interest exists if counsel must choose between advancing his client's interests in a fair trial and advancing other interests to the detriment of his client's interest. *Acosta v. State*, 233 S.W.3d 349, 355 (Tex. Crim. App. 2007). A potential conflict of interest, without more, is insufficient to reverse a conviction. *See id.* at 350. We will not speculate about a strategy an attorney might have pursued but for the existence of a potential conflict of interest absent a showing that the conflict became actual. *Routier v. State*, 112 S.W.3d 554, 585 (Tex. Crim. App. 2003). We review the trial court's refusal to dismiss appointed counsel for an abuse of discretion. *King*, 29 S.W.3d at 566.

Gamez never explained at trial what his attorney's alleged conflict of interest was or proved that it became an actual conflict of interest. Nor did he prove that his attorney's alleged

delays or failures to show him the video and file undisclosed motions entitled him to new counsel. Gamez's counsel stated in court on the morning of trial without dispute that he had shown Gamez the video segments. Gamez did not explain how any delay in showing him the video affected his defense. Gamez's attorney filed motions, albeit nineteen months after the indictment, and Gamez never showed what motions he felt should have been filed that his counsel did not file or how not filing the motions (or the timing of filing the motions) affected his ability to prepare and present a defense. Both his attorney and the prosecutor asserted that the State had disclosed more evidence pretrial than required. On this record, we cannot say that the trial court abused its discretion by refusing to remove appointed counsel.

**Admission of evidence**

Gamez complains about the admission of Gonzales's sister's testimony about her brother's thought processes and Shaw's testimony about a statement by John Salinas about running over Gonzales.

<u>The trial court did not abuse its discretion by permitting Gonzales's sister to speculate that Gonzales never would have traded his truck for cocaine.</u>

Gamez asserts that the trial court should not have overruled his objection in the following exchange during the State's examination of Gonzales's sister:

Q. Corinne, I want to ask you, in your mind would your brother have ever traded his truck and/or any of the personal belongings for crack cocaine?

A. No.

Q. And why do you believe that?

7

A. Because—

MR. URRUTIA: I'm going to object to speculation.

THE COURT: I'll let her state her opinion. Proceed.

THE WITNESS: Not the way my brother that I know him, he would sell his tools, he would sell anything other than his truck, his motorcycle, anything like that. Because that's just the way he was.

We review a decision to overrule an objection to the admission of evidence for an abuse of discretion. *Green v. State*, 934 S.W.2d 92, 102 (Tex. Crim. App. 1996). Testimony must have probative value to be admissible and must be based on personal knowledge. *See* Tex. R. Evid. 401, 402, 602. Testimony that is based solely on speculation and conjecture lacks the probative value to be relevant or admissible. *See Turro v. State*, 950 S.W.2d 390, 403 (Tex. App.—Fort Worth 1997, pet. ref'd). Lay witness opinion testimony is admissible if the opinion is (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the testimony or the determination of a fact in issue. Tex. R. Evid. 701. When considering whether to admit a lay witness's opinion of whether a defendant acted with a culpable mental state, courts may admit opinions that are interpretations of the witness's objective perception of events. *Fairow v. State*, 943 S.W.2d 895, 899 (Tex. Crim. App. 1997). For instance, a trial court did not abuse its discretion by allowing prison guards to give their opinion about whether a prisoner who they saw strike a guard did so intentionally or accidentally. *See id*. The opinion must be rationally based on the perception. *Id*. at 899-900. Whether an opinion meets the fundamental requirements of Rule 701 is within the sound discretion of the trial court and its decision regarding admissibility should be overturned only if it abuses its discretion. *Id*. at 901.

We first note that Gamez did not object to the question and answer regarding whether she thought that her brother would sell his truck or belongings for crack. No error is preserved regarding that testimony. *See* Tex. R. App. P. 33.1; *Gonzales v. State*, 685 S.W.2d 47, 50 (Tex. Crim. App. 1985) (granting of motion in limine does not alone preserve error; "absolutely necessary that an objection be made at the time when the subject is raised during the trial"); *see also Young v. State*, 137 S.W.3d 65, 70 (Tex. Crim. App. 2004) (failing to request an instruction to disregard or a mistrial waives review of errors not complained of).

We also find no abuse of discretion in the admission of Gonzales's sister's explanation for her opinion. While she could not know for certain under what conditions Gonzales would sell the truck, she had given a basis for her opinion through testimony about her knowledge of its importance in his life. She said that he had lived in his truck for the previous nine months because he was a free spirit. Living in the truck and parking near downtown, he could be closer to his construction jobs and he could send the money saved to his kids instead of paying rent. She testified that he kept many of his tools in his truck as well as clothes, towels, and documents like the truck title and his checkbook. She said he chose the parking place because it was near a police substation and her sister-in-law's home. He worked on the truck to get it running well. She helped him try to get the title properly transferred to him, and he repeatedly obtained temporary license plates during that time. The objected-to testimony may have assisted the jury in determining the consequential fact of whether he consented to the transfer of property—i.e., whether Gamez killed him in the course of stealing his truck (as opposed to taking it consensually). On this record, we conclude that the trial court did not abuse its discretion by allowing the witness to explain why

9

she believed that her brother would not have traded his truck or his personal belongings for crack cocaine.

We further conclude that, even if the trial court did abuse its discretion in overruling the objection, the admission of this evidence did not affect Gamez's substantial rights. The jury could assess for itself whether the circumstances indicated a willing exchange or was more consistent with a robbery. Her explanation of the basis for her opinion added little to the background testimony or the unobjected-to opinion itself. Further, the jury heard other testimony that Gamez said that Gonzales fought to keep his belongings, which is more straightforward support for the robbery finding than Gonzales's sister's opinion that he would not sell his belongings. We find no abuse of discretion in the admission of this testimony and no harm from any error in its admission.

The trial court did not abuse its discretion by admitting testimony from Shaw that John Salinas—Gamez's non-testifying codefendant—said "we ran him over, it was like running over a speed bump."

Gamez complains that the admission of Shaw's testimony violated a trial-court order regarding Shaw's testimony about statements he claimed Gamez and John Salinas made about how they acquired Gonzales's truck. Shaw could testify about what each man said about their respective actions, but the State would have to approach the bench before inquiring about what Salinas said regarding Gamez's actions. As the State questioned Shaw, the following colloquy occurred:

> STATE: So specifically when you were talking to Mario, what did Mario tell you as far as how he got the truck and the motorcycle?
>
> SHAW: He jacked it from some dude.
>
> STATE: Okay. And did John Angel tell you anything about his role in the robbery?

10

SHAW:  He told me he stabbed him.

STATE:  Okay.  And did Mario say anything after John Angel told you that he stabbed him?

SHAW:  Yeah, he said that he hit him and the dude fell to the ground.

STATE:  Okay.  Did Mario tell you what happened after the dude fell to the ground?

SHAW:  That he jumped in the car, the truck.

STATE:  Okay.  And did Mario tell you who was driving?

SHAW:  Mario was driving.

STATE:  Okay.  And did Mario tell you what happened as he was driving off?

**SHAW:  No, that's when Angel jumped in and was like, yeah, we ran him over, it was like running over a speed bump.**

STATE:  Okay.

SHAW:  Pretty much after then Mario was quiet.  He was just chilling.

(Emphasis added.)  Gamez contends that the trial court erred by allowing the emphasized testimony.

We first note that Gamez did not object to the testimony or seek to have it struck and therefore did not preserve any error for our review.  *See* Tex. R. App. P. 33.1; *Gonzales*, 685 S.W.2d at 50; *see also Young*, 137 S.W.3d at 70.

Even if error were preserved and existed, Gamez was not harmed by this testimony because similar evidence came in through other testimony.  *See Livingston v. State*, 739 S.W.2d 311, 332 n.13 (Tex. Crim. App. 1987).  Zamora's statement to police had already been admitted into evidence when Shaw testified.  She reported similar comments—that Gamez said he hit Gonzales and that John Angel Salinas stabbed him, that Gonzales fought to keep his possessions, and that

11

Gamez drove the truck off and ran over Gonzales—though she recanted that statement at trial. Gonzales's injuries were consistent with having been run over by a vehicle. State's witnesses testified about hair and blood consistent with Gonzales's hair and blood that they found on the underside of the truck. The admission of Shaw's testimony that Gamez ran over Gonzales did not affect Gamez's substantial rights.

**The evidence was sufficient to support the conviction.**

In reviewing the sufficiency of the evidence to support a conviction, we determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In making this determination, we consider all evidence that the trier of fact was permitted to consider, regardless of whether it was rightly or wrongly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We view this evidence in the light most favorable to the verdict. *Id.* The jury, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Montgomery v. State*, 369 S.W.3d 188, 193 (Tex. Crim. App. 2012). Therefore, we presume that the jury resolved any conflicting inferences and issues of credibility in favor of the judgment. *Id*. Circumstantial evidence is as probative as direct evidence in establishing an actor's guilt, and an actor's guilt can be established with circumstantial evidence alone. *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013). Every fact need not point directly and independently to the guilt of the appellant; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Id*.

12

Capital murder as charged invokes several statutes. A person commits murder if he intentionally or knowingly causes the death of an individual, *see* Tex. Penal Code § 19.02(b), and commits capital murder by intentionally murdering someone in the course of committing a robbery, *id.* § 19.03(a)(2). A person commits robbery if, in the course of committing a theft and with the intent to obtain or maintain control of the property, he either intentionally, knowingly, or recklessly causes bodily injury to another or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. *Id.* § 29.02. A person commits theft if, with the intent to deprive the owner of property, he takes the property without the owner's effective consent. *Id*. § 31.03. A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result. *Id.* § 6.03(a).

Gamez contends that the evidence was insufficient to show that he caused Gonzales's death in the course of robbing him, to show that he actually caused Gonzales's death, and to show that he intentionally caused Gonzales's death. He contends testimony that he obtained the vehicle through a consensual exchange for crack cocaine proves that he did not rob Gonzales. He argues that the State failed to prove that he, not somebody else, killed Gonzales because under the State's timeline Gonzales lay in the street for at least thirty minutes and could have been run over by others. He further contends that no evidence shows he intentionally killed Gonzales and that, to the contrary, evidence shows at most that he accidentally ran over Gonzales. He asserts that testimony that Salinas asked Gonzales if he was okay undermines the intent element and thus the capital murder conviction.

13

A jury could have rationally determined beyond a reasonable doubt that Gamez running over Gonzales caused Gonzales's death. The evidence of Gonzales's injuries connected his death to an automobile running over him. The blood and hair evidence from Gonzales's truck supported a finding that it ran over him. Testimony that Gamez drove the truck pegged him as the driver. The jury saw snippets from motion-activated security cameras showing a glimpse of the conditions at that time. There is no evidence of any other vehicle striking Gonzales, just an assertion that it could have happened. The jury was not required to elevate this assertion over the evidence in the record that connected Gamez driving the truck to Gonzales's death.

The evidence is also sufficient to support the finding that Gamez robbed Gonzales. There was testimony that Gamez said he "jacked" the truck from Gonzales. Reports that Gamez said he punched Gonzales and knocked him to the ground support a finding that Gamez intended to deprive Gonzales of property without his consent, as does the stab wound reportedly inflicted by John Salinas in the same interaction. The jury could have reasoned independently of Gonzales's sister's opinion testimony that Gonzales did not willingly part with his tools, his documents, his mementos, and what in effect was his home. Gonzales's sister's opinion supported that idea, as did Zamora's recanted statement that Gamez reported that Gonzales fought to keep his belongings. Gonzales's injuries clearly satisfy the robbery statute's bodily injury requirement, and the circumstances are sufficient support for an inference that Gamez placed Gonzales in fear of imminent injury in order to effectuate the theft.

Finally, the record contains sufficient evidence to support the finding that Gamez intentionally killed Gonzales. Intent to kill is a question of fact for the jury to determine. *Brown*

14

*v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003). In determining whether intent to kill was proven, the jury can use its collective common sense and may apply common knowledge and experience. *See Rodriguez v. State*, 90 S.W.3d 340, 355 (Tex. App.—El Paso 2001, pet. ref'd). The jury may infer the intent to kill from any evidence that it believes proves the existence of that intent. *Brown*, 122 S.W.3d at 800. Intent can be inferred from such circumstantial evidence as the person's acts, words, and conduct. *Laster v. State*, 275 S.W.3d 512, 524 (Tex. Crim. App. 2009); *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). The jury could infer intent from Gamez running over Gonzales while robbing him. The testimony that Gamez stopped the vehicle so that John Salinas could inquire about Gonzales's condition does not necessarily show the absence of the required intent.

We further note that the jury could have found Gamez's leaving Gonzales on the street, his attempt to avoid the police when he was caught in Chavira's car, and his alleged threats to Shaw if he told anyone how Gamez obtained the truck are consistent with knowledge of intentional wrongdoing. *See Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) (fleeing as evidence of guilt); *Johnson v. State*, 425 S.W.3d 344, 346 (Tex. App. Houston [1st Dist.] 2011, pet. ref'd) (threats to potential witnesses as evidence of guilt).

15

**CONCLUSION**

Having found no reversible error presented, we affirm the judgment.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Pemberton and Bourland

Affirmed

Filed:   June 11, 2015

Do Not Publish