

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00325-CR

_____

CHRISTOPHER REVILL, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 213th District Court
Tarrant County, Texas
Trial Court No. 1596013R

Before Sudderth, C.J.; Kerr and Bassel, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

### I. Introduction

The indictment alleged that on or about October 10, 2016, Appellant Christopher Revill intentionally or knowingly abducted Typhenie Johnson with the intent to terrorize her.[1] A jury found Revill guilty of aggravated kidnapping as alleged in the indictment. The trial court found the habitual-offender's notice true and sentenced Revill to life imprisonment.

On appeal, Revill raises four points. First, he argues that the evidence is insufficient to support the jury's verdict. In his second, third, and fourth points, he attacks the admission of a witness's testimony describing two encounters between Revill and Typhenie[2] that the witness had observed. Specifically, in point two, Revill contends that the evidence was not relevant; in point three, he maintains that even if the evidence was relevant, its probative value was substantially outweighed by the danger of unfair prejudice; and in point four, he asserts that the witness lacked personal knowledge.

We hold that the circumstantial evidence was sufficient to support the jury's verdict and that the two encounters between Revill and Typhenie about which Revill complains were relevant, that their probative value was not substantially outweighed

---

[1]The State waived a second count.

[2]For clarity's sake, we refer to Typhenie Johnson as Typhenie, Asher Johnson (Typhenie's brother) as Asher, and Debra Johnson (Typhenie and Asher's mother) as Ms. Johnson.

by the danger of unfair prejudice, and that the witness who described the two encounters had personal knowledge. Thus, we overrule Revill's four points and affirm the trial court's judgment.

## II. Background

The trial on guilt consisted of five days of testimony. We first provide a summary as an overview. When addressing Revill's sufficiency challenge, we will address the evidence in greater detail.

Typhenie disappeared on October 10, 2016. She has never been seen or heard from again.

On the evening that Typhenie disappeared, she was planning to cook dinner for a prospective boyfriend at the apartment that she shared with her brother Asher. Her plans encountered a hitch when she discovered that her jealous, controlling, and potentially violent ex-boyfriend, Revill, happened to be visiting Asher at their apartment that same evening. Before the night was over, Typhenie had vanished, and Revill was the last person with whom she had been seen.

## III. Sufficiency

In his first point, Revill contends that the evidence is insufficient to support his conviction and that the guilty finding amounts to "impermissible speculation." He asserts that strong suspicions or strong probabilities are not enough, and he correctly notes that his mere presence the evening that Typhenie disappeared, standing alone, is insufficient to support a conviction. *See Valdez v. State*, 623 S.W.2d 317, 321 (Tex.

Crim. App. [Panel Op.] 1979); *Phillips v. State*, 297 S.W.2d 134, 135 (Tex. Crim. App. 1957); *Allen v. State*, 249 S.W.3d 680, 704 (Tex. App.—Austin 2008, no pet.). Revill asserts, "While the evidence may be sufficient to prove that an offense was committed by someone, the evidence does not show beyond a reasonable doubt that [he was] the person who committed this act."

We disagree. The evidence was sufficient for a rational juror to find beyond a reasonable doubt that Revill had committed the charged offense.

## A. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light

4

most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). To determine whether intent existed, the jury may consider events before, during, and after the offense and may infer intent from the defendant's acts, words, and conduct. *Modarresi v. State*, 488 S.W.3d 455, 463 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *see Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004); *Hester v. State*, No. 02-18-00448-CR, 2020 WL 479286, at *5 (Tex. App.—Fort Worth Jan. 30, 2020, pet. ref'd) (mem. op., not designated for publication). As long as the cumulative effect of all the incriminating facts are sufficient to support the conviction, each fact need not point directly and independently to the appellant's guilt. *Guevara*, 152 S.W.3d at 49. Motive is a significant circumstance indicating guilt. *Id.* at 50. Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations are probative of wrongful conduct and are also circumstances of guilt. *Id.* The due process guarantee

requires a reversal and acquittal only "if, given all of the evidence, a rational jury would *necessarily* entertain a reasonable doubt as to the [appellant's] guilt." *Id.* at 49.

## B. Elements of and Definitions Relevant to Aggravated Kidnapping

"A person commits [the offense of aggravated kidnapping] if he intentionally or knowingly abducts another person with the intent to . . . terrorize him . . . ." Tex. Penal Code Ann. § 20.04(a)(5). "'Abduct' means to restrain a person with intent to prevent his liberation by . . . secreting or holding him in a place where he is not likely to be found[] or . . . [by] using or threatening to use deadly force." *Id.* § 20.01(2)(A), (B). "'Restrain' means to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person. Restraint is 'without consent' if it is accomplished by . . . force, intimidation, or deception . . . ." *Id.* § 20.01(1)(A). The kidnapping provisions do not define "terrorize."

## C. Discussion

### 1. Leading up to October 10, 2016, friction existed between Revill and Typhenie.

Typhenie and Asher were twins. In the latter half of 2014, Typhenie moved to the DFW area and lived with Asher.

Around October 2015, Typhenie and Revill started their relationship, and they lived together for a while at Revill's mother's house. According to Asher, around late May or early June 2016, Typhenie and Revill moved into Asher's apartment with him.

6

Asher described Revill as jealous, controlling, and aggressive. "Typhenie would cry," Asher said.

Barbara Alvarado, a neighbor of Revill's mother, testified that she had seen Typhenie at Revill's mother's house. Alvarado described two instances, both of which she placed in July 2016, when she saw Typhenie and Revill interact.[3]

In the first instance, Revill was in the driveway when Typhenie pulled up in a car. Typhenie got out of the car and started walking toward Revill, but Typhenie stopped when Revill started walking very quickly toward her. Alvarado said that Revill got in Typhenie's face and that she looked down. Alvarado related how Revill had then grabbed Typhenie's arms and had squeezed them to the point that Typhenie commented or complained in some fashion. Revill said, "Why didn't you pick up your fucking phone when I called?" With her head down, Typhenie responded, "I couldn't. I was driving." Alvarado said that Revill had "just kept yelling at her" and had touched Typhenie's chin to lift her face so that she would look at him, but Alvarado said that Typhenie had persisted in looking down. Eventually Revill noticed that Alvarado was watching; after they made eye contact, other than lowering his

---

[3]Alvarado admitted that she did not know the two events' exact dates. She remembered that it was hot outside and acknowledged that Texas could be hot from May through September. She said that the events occurred while she was picking up her grandchildren from school, so the events might have occurred in May. She also said that she had picked July because her birthday was in that month and because she had watched her grandchildren the whole time in July. For identification purposes, we refer to the two events as the July 2016 events.

voice, Revill "just kept doing what he was doing." Alvarado described Typhenie as scared. The event ended when Typhenie turned around, got in her car, and left.

In the second instance, Alvarado described how Typhenie had pulled up in her car, had gotten out of it, and was smiling as she went around to the driveway to meet Revill. Angry, Revill met Typhenie and said, "What the fuck are you wearing?" Typhenie "just put her head down." Alvarado stated that Typhenie was wearing a normal summer dress; Alvarado saw nothing inappropriate about Typhenie's dress. Alvarado said that Revill had gotten "right in her face" and had yelled at Typhenie and that Typhenie had just looked down. Like the time before, Alvarado saw Revill grab both of Typhenie's arms, and like the time before, when Revill noticed that Alvarado was watching him, he lowered his voice. Other than lowering his voice, Revill did not change his behavior: "He was still holding onto her, and he was still talking to her but just in a lower voice. But he was still angry." Alvarado, who was carrying groceries, remained outside with the hope that Revill would stop if he knew that she was watching him, and he did.

Alvarado was not the only person exposed to the dynamics between Revill and Typhenie. Ms. Johnson testified that Typhenie had called her quite often to talk about her relationship with Revill. When asked whether Typhenie had ever expressed any concerns about jealousy or possessiveness, Ms. Johnson responded, "There [were] several times that she'd call me after arguments on what she was wearing, how she wore her makeup. He thought that she shouldn't wear makeup. She should be

8

wearing more frumpy clothing." According to Ms. Johnson, Typhenie had acquiesced and had changed her appearance: she started wearing less makeup, stopped doing her hair as nicely as she had before, and began wearing somewhat baggy clothing. Ms. Johnson related that Typhenie had explained that she changed her appearance "[b]ecause [Revill] didn't want other men looking at her." Typhenie also confided to Ms. Johnson that sometimes Revill would get physical: "[H]e'd grab her wrist and her upper arms." Once, after an argument, Typhenie told Ms. Johnson that Revill had said, "[I]f he couldn't have her[,] nobody could." Ms. Johnson advised Typhenie to break off the relationship because it was not healthy.

In early August 2016, Typhenie and Revill broke up, and Revill moved out of Typhenie and Asher's apartment. Asher said that despite the breakup, Revill continued to come over to their apartment to hang out with him.

According to Asher, when Revill came over to visit, Typhenie usually was not there, or if she was there, she "definitely stayed segregated." When Revill visited Asher, Revill repeatedly asked him whether Typhenie was talking to someone else or was cheating on him.

Asher's girlfriend, Jessica Smith, moved into the apartment with Typhenie and Asher in August 2016, after Typhenie and Revill had broken up and after Revill had moved out. Smith said that after the breakup, Revill nevertheless came back to the apartment almost every day to hang out with Asher, but when Revill came over,

9

Typhenie stayed in her room and avoided him. Smith explained that Typhenie had broken up with Revill and did not want to be with him.

## 2. On October 10, 2016, Revill discovered that Typhenie was meeting a prospective boyfriend, and before the night was over, Typhenie disappeared.

### a. Typhenie planned a dinner date with a prospective boyfriend at her and Asher's apartment; Asher and Revill planned to watch football together at the apartment that same evening.

In addition to living with Typhenie and Asher, Smith worked with Typhenie at an insurance company. Smith was aware that in October 2016, Typhenie was talking to Russell Brown but was not yet dating him and that on October 10, 2016, Typhenie had invited Brown over to the apartment to cook dinner for him.

After work on October 10, 2016, and after the two women returned to the apartment, Typhenie changed into more comfortable clothing, which included, among other items, a camisole and black ankle socks. Smith and Typhenie heard a knock at the door and discovered that it was Revill. Revill had arrived with a six-pack of beer and shots from the corner store; Asher said that the shots came with their own little plastic glasses. Smith and Typhenie were surprised and confused; Typhenie was having Brown over, and she did not want Revill there at the same time.

When Revill went to the balcony[4] (Smith thought that Revill had gone to smoke a cigarette), Typhenie and Smith spoke to Asher and discovered that Asher

---

[4]Witnesses referred to the balcony interchangeably as either a balcony or as a patio, but the apartment was on the third floor, so it was a balcony.

was not aware that Typhenie had invited Brown over for dinner. Asher explained that Revill had texted him earlier in the day and that they had made plans to watch football together. Asher described Typhenie and Smith as "[a] little discombobulated," "really surprised," and not happy at all that Revill was there.

### b. Typhenie tried to prevent Revill and her prospective boyfriend from meeting each other.

Smith said that Typhenie did not want Revill and Brown in the apartment at the same time, so as a ruse to get out of the apartment, Typhenie told everyone that she was going to the store; Typhenie hoped to drive to a Walmart and meet Brown there. For Asher's part, he thought that Typhenie had gone downstairs to intercept Brown at the front gate to prevent Revill and Brown from meeting.

Asher explained that he and Revill were on the balcony, and from the balcony, Asher said that he could see Typhenie try to back her car up, stop because the brakes had failed, and then pull back into the parking spot. Asher related that from the balcony he could see a puddle of brake fluid under the car. Typhenie then texted or called Asher to tell him that her brakes were not functioning properly again. Asher told Typhenie that he had driven her car earlier that day and that the brakes had worked "just fine." Asher was aware that someone had worked on the brakes and had repaired them, but he did not know who had repaired them or when they had been repaired. After Revill saw that Typhenie was having problems, he went down to

11

the parking lot. Smith said it was fifteen to twenty minutes after Typhenie had left that Revill went downstairs.

To make sure that everything remained cordial, Asher peeked out the balcony window and saw that Revill had stopped Typhenie.[5] Asher said that "it was getting loud verbally," so he had concerns. Asher related that he could see Revill and Typhenie talking near Revill's car, which was visible from the balcony but that he could not make out what they were saying. According to Asher, Typhenie spoke with her hands, and her hand gestures were saying, "[J]ust go -- just leave, . . . just leave already." Asher said that in response, Revill just stood there. After watching them talk for five to ten minutes, Asher said that he went back inside the apartment. About Typhenie and Revill's exchange, Asher said, "It was cordial. It wasn't aggressive."

### c. The prospective boyfriend arrived; Revill indicated that he was leaving.

After another five to ten minutes passed, Asher went out to the balcony again and saw Typhenie walking back from the front office building by the gate but did not see Revill. Because only Brown came upstairs (Brown had been to the apartment before), Asher deduced that Revill had stopped Typhenie a second time. Brown mentioned that he had tried to talk to Typhenie but was not able to because she and

---

[5]Asher said that Revill had stopped Typhenie "before she had made it to the gate." Later Asher stated that he had seen Typhenie "walking back from the front office building by the gate." Contextually, assuming that the apartment complex was a gated community, Typhenie may have been walking to the gate to meet Brown.

Revill were having a conversation. Trying to be discreet, Asher went to the balcony's screen door, listened, and recognized Revill's and Typhenie's voices coming from the side of the garage. Beside the garage was a grassy area.

Eventually Revill came back upstairs, introduced himself to Brown, collected his remaining beers and shot glasses, and said to Asher, "I should have known this all along," which Asher understood to mean that Revill had thought that Typhenie was cheating on him. When Revill met Brown in the apartment, Asher described Revill as upset and said, "It was a little -- it was just off. You could just tell it wasn't his normal, just trying to be calm. It was just weird. It was a weird vibe that was put out." Asher asked Revill where Typhenie was, and Revill responded that she had jumped in a car with a mechanic. Asher stated that he did not know what Revill was talking about because Asher had not seen anyone else in the parking lot area other than Typhenie and Revill. By this time, it was getting dark, so working on Typhenie's car would have been difficult.

> **d. Typhenie did not return to the apartment and did not respond to efforts to contact her by phone; while looking for Typhenie, Asher discovered that Revill had not yet left their apartment complex.**

After Revill left the apartment, Asher, Smith, and Brown all tried to contact Typhenie by calling or texting her but were unsuccessful, so after about fifteen minutes, Asher and Brown went down to the parking lot where they saw Typhenie's car with her keys on the driver's-side roof. Asher and Brown continued their search

13

for Typhenie. Photos of the apartment building show that the street level had a series of one-car garages. The two men then went to the corner of the last garage where Asher noticed something and stopped Brown from proceeding.

Asher saw Revill's car backed up over the curb onto a grassy area near the back of the garage behind a retaining wall. Asher agreed that this was not where people normally parked and that he could not think of any legitimate reason for Revill to park there. Asher did not recall if the doors on the passenger side were open, but both the front and rear driver's-side doors were open, as was the trunk, and Revill appeared to be doing something behind the trunk.

Because they could not see what Revill was doing, Asher and Brown decided to circle back and traverse a breezeway leading to the building's rear where they hoped to have a better view of what Revill was doing behind his car. When asked why he had not just walked around the corner and talked to Revill, Asher responded, "Knowing [Revill's] past--."[6]

---

[6]Before Asher could complete his sentence, defense counsel objected that his answer was nonresponsive but did not move to strike the statement. Even without Asher's completing his sentence, Revill himself perhaps provided the jury with some insight. The jury saw photos of Revill after his arrest; all the photos came in without objection. The photos showed that Revill did not have any injuries, such as scratches, but they also showed that Revill's chest, belly, legs, arms, hands, and neck were covered with tattoos. Among the tattoos that we can make out are "Vicious"; "Real Goon" with the face of a goon with furrowed brows and a gaping mouth; "Crip Hard"; "Kill 'Em All Cuz"; "FAM" with the A upside down; Ben Franklin's portrait; a man wearing a ski mask and pointing a rifle or shotgun at another man who has his back turned away from the gunman and—in what might be described as a cowering manner—uses his hands to cover his head; "FUNKYTOWN"; a skull; the portrait of

14

### e. Revill left before Asher could determine what Revill was doing; Asher found Typhenie's cell phone.

By the time Asher and Brown reached the back of the building, however, Revill had already left, his trunk was closed, and he was driving at "a pretty good clip." Where Revill had been parked, Asher found a black sock that he said was consistent with the type that Typhenie generally wore, Typhenie's cell phone, and some shot glasses.[7] According to Smith, the black sock that Asher found was like the socks that Typhenie had been wearing earlier that evening.

Even as Asher watched Revill pulling out of the apartment complex, he called Revill multiple times. Sometimes Revill did not answer, but within sixty seconds, Revill had answered one of Asher's calls. Asher told Revill, "[T]his doesn't look good; you need to get back here right now," and Revill responded, "It sounds like you're blaming me for something." Asher said that Revill had told him that he had just passed the corner, that he was going to make a U-turn, and that he would return. Asher estimated that Revill was only about a block and a half away and that he would return in no more than five minutes; Revill did not return, so Asher continued to call

---

a man whose mouth is duct-taped shut and whose forehead appears to be bleeding; and, behind Revill's left ear, a sergeant's insignia. "It is a reasonable inference that tattoos reflect things near and dear to the heart of a tattooed person." *Bias v. State*, 937 S.W.2d 141, 144 (Tex. App.—Houston [1st Dist.] 1997, no pet.).

[7]Asher said that the plastic shot glasses looked like someone had tried to stuff them down the storm drain but that "they didn't make it down the storm drain." A detective found a shot glass in the grassy area too. That shot glass was tested for DNA, and Revill could not be excluded.

him. The next time that Revill answered, he told Asher that he was on Interstate 30, that the police were pulling him over, and that he had to quickly hang up.

### f. Asher's girlfriend called the police; after a long delay, Revill returned.

Asher and Brown returned to the apartment, and then Smith called the police, who arrived within about fifteen minutes.

Officer Rayune Smith responded to a missing person call at 10:58 p.m. on October 10, 2016. After talking to Asher, Smith, and Brown for about thirty minutes, Officer Smith had Asher call Revill. When Revill answered, Officer Smith spoke to Revill, informed him that he would be listed as a suspect in a missing-person case, and asked him to return to the apartments. Officer Smith also asked Revill where Typhenie was, and Revill responded that he did not know and that when he had finished talking to her, she was speaking to some old man about getting her car fixed. Officer Smith did not know if Revill meant that Typhenie had been talking to someone on her phone or in person. Revill told Officer Smith that he was on his way back.

According to Officer Smith, Revill, however, did not return for another forty-five minutes to an hour. Officer Smith related how after Asher had told him and his assist officer, Officer Jaimy Faigin, where Revill lived, he and Officer Faigin were surprised at how long it took Revill to get back. Officer Faigin estimated that Revill took forty to fifty minutes to return from a location that Officer Faigin thought

16

should have taken Revill only twenty to thirty minutes. Another witness later testified that from address to address, Google estimated the time at twenty-five minutes.

Asher stated that Revill eventually had returned to the apartment complex, but Asher estimated that about an hour and a half had elapsed from the time that Revill had left until the time that he had returned. Asher said that when Revill had returned, his clothing was the same "[m]inus the white tee under the flannel." Asher thought that Revill had worn a white undershirt under his flannel shirt earlier that day and asserted that Revill normally wore "white tees under his flannel."

When Revill arrived, Officer Smith described Revill as sweaty, which Officer Smith thought was unusual because it was nighttime in October. When Revill was asked why he was so hot, Officer Smith recalled that Revill had answered that it was due to the heat in his car.

Officer Faigin described Revill as very sweaty and out of breath. According to Officer Faigin, Revill attributed being sweaty to the heat, but Officer Faigin noted that it was early October and somewhat chilly.

### g. The police talked with Revill at the scene; they arrested him.

Officer Smith stated that when Revill had arrived, he neither detained nor arrested him; Revill stayed voluntarily and voluntarily answered his questions. Revill told Officer Smith that he had never made it home because Asher had called him. According to Officer Smith, Revill was very cooperative. Officer Faigin asked Revill if she could pat him down for weapons for officer safety, and Revill agreed.

17

Although Officer Smith knew that Revill had parked in the grassy area, Officer Smith asked Revill—apparently in an attempt to test Revill's veracity—why Revill had parked near the dumpster, which Officer Smith knew was nowhere near the grassy area, and Revill answered that he was cleaning out his car and was throwing out receipts and loose trash. Officer Smith looked in the dumpster but did not see any loose receipts or trash. He stated that he leaned in with a flashlight and saw only trash bags.

Officer Smith maintained that there was no confusing the area where the dumpster was located with the grassy area into which Asher and Brown had seen Revill back his vehicle. A diagram of Typhenie and Asher's apartment building showed that their apartment looked out over a parking lot; behind their building was a retaining wall that angled to partially encompass the building's rear corner; and beside their building was the grassy area. Beyond and adjacent to the grassy area were six parking spaces for cars, and the dumpster was in the sixth space—the space farthest away from the grassy area. Officer Smith stated that when he arrived, the parking spot next to the dumpster was open.

Revill gave Officer Smith permission to search his trunk. After looking, given the other items that Revill had in the trunk, Office Smith did not think that there was room to fit a body. Officer Faigin differed in her opinion and asserted that even with the items in the trunk, a body would probably have fit. In the trunk was a large ice

chest and, according to Officer Smith, an assortment of other items that a person would expect to find.

Based on information that Asher had given him, Officer Smith had another officer check with the police department to see if anyone had stopped Revill on Interstate 30. The result: there was no record showing that an officer had stopped Revill that night.

Detective Pat Henz also spoke with Revill at the scene. "And because of the nature of the case," Detective Henz explained, "I went ahead and read him his [*Miranda*[8] warning] that we do for any suspects or person in custody." When Detective Henz asked Revill about being pulled over, Revill clarified that he had not actually been pulled over. Instead, Revill explained that an officer had pulled alongside him and had told him to watch his speed. Revill declined to help Detective Henz with a timeline because he was concerned that any information that he provided might be used against him at some point. When Revill denied parking his car in the grassy area, Detective Henz confronted him with the fact that the tread marks left in the grassy area matched the tire treads on his vehicle; Revill responded, "Ah, okay. Alright."[9] Detective Henz also asked Revill why he was so sweaty, to which Revill

---

[8]*See Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 1630 (1966).

[9]A forensic scientist confirmed that the tread marks left in the grassy area were similar to and consistent with the tires on Revill's car. Additionally, shoes leaving a distinctive star-shaped pattern left prints in the grassy area. The soles of Revill's shoes had this distinctive star-shaped pattern on them.

responded that he was always sweaty, especially after he had been drinking; Revill admitted that he had been drinking earlier, denied drinking "a whole lot," but declined to give any specifics; he explained that he did not want to "go down that route" where others could say, "You got drunk, and you did this." As they discussed Typhenie, Revill did something that caught Detective Henz's attention:

> [Revill] immediately said, "That girl." And that's a key point that, as an investigator when we do interviews, [there are] things that we try to listen for, ways that somebody expresses a story. And this is what I would call a classic sign of distancing themselves from this person. He mentioned that he loved her, that they were in this relationship, but at that moment[,] he said, "That girl[,"] referred to her as "that girl[."] And the rest of the entire interview, never used Typhenie's name. Never called her by name. Never said anything other than "she" . . . if I . . . mentioned Typhenie. So that was . . . the one thing that really stuck out from the beginning.

Detective Henz stated that he had repeatedly asked Revill what he could do to help find Typhenie but that Revill had not expressed any concern about her. According to Detective Henz, Revill was more concerned about what was happening to him and to his car and was worried about being late for work. Officer Faigin also said that Revill had seemed disinterested in helping to find Typhenie. After Detective Henz spoke with Revill, "a decision was made to take him downtown," and Detective Henz entrusted Revill to one of the patrol officers.[10]

---

[10]The clerk's record shows that Revill did not bond out.

### 3. The investigation shed additional light on the events of October 10, 2016.

#### a. The search expanded to Revill's mother's house.

At 7:15 a.m. the next morning, Crime Scene Officer Pilar Ramirez went to Revill's mother's home. In the backyard, Officer Ramirez found a camisole shirt; a black bra with a bent metal clasp and with a tear in the lace; a white tank top that looked more like a rag than something someone would wear; a black smartwatch with a broken, missing clasp; and a silver bracelet. Also in the backyard near where the other items were found were impressions made by shoes with a distinctive star-shaped pattern.

#### b. The evidence found in Revill's mother's backyard could be tied to both Typhenie and Revill.

The soles of Revill's shoes had the same distinctive star-shaped pattern as the shoes that had left impressions in the backyard. Circumstantial evidence suggested that the smartwatch found in the backyard belonged to Revill. Asher asserted that Revill wore a smartwatch, and in Revill's bedroom, a detective found a smartwatch box that matched the model found outside.

The detective determined that the size of the bra found in the backyard matched Typhenie's size. DNA recovered from the tan camisole and the black bra was consistent with Typhenie's.

The torn lace on the black bra had a minor DNA contributor from which Revill could not be excluded, but the statistical probabilities were insignificant—one

in fifteen African Americans, one in five Caucasians, and one in two Southwestern Hispanics. Revill's expert testified that the odds were so attenuated that the results should have been classified as inconclusive.

Revill's DNA was found on the partial white tee found in the backyard of Revill's mother's house.[11] A minor DNA contributor was found as well, but Typhenie was excluded as the minor contributor.

### c. Revill's mother floated a nonincriminatory theory to explain how Typhenie's clothing had ended up in her backyard.

Revill's mother testified that it was common for Typhenie to spend the night with Revill at her house and that she still had clothing there. Revill's mother did not know how any clothing had gotten into her backyard but thought that her dogs might have dragged the clothing outside. On the other hand, for the dogs to go into the backyard or to return from it, Revill's mother said that she had to open the door. She acknowledged, however, never having seen the clothing in the backyard before. Regarding the smartwatch and the bracelet, she had no idea why either of them were in her backyard.

---

[11]As noted previously, Asher testified that when Revill returned to the apartments, he was not wearing the undershirt that he had worn earlier in the evening; according to Asher, Revill normally wore tees under his flannel shirts. What is not clear is whether the undershirt in the backyard was the same undershirt that Revill had worn earlier in the day. What is clear is that the undershirt had Revill's DNA on it. Given the undershirt's condition, whether it was an undershirt or a rag was also unclear. One officer stated that because the undershirt was torn, it could not be worn and would qualify as a rag. It was "[s]omething that was once a shirt that might be used as a rag now."

### d. Not all the efforts to find evidence produced results.

Behind Revill's mother's house was a wooded area. A detective testified that the entire homicide unit went to that wooded area, formed up into a line, and walked through the area—a procedure they referred to as a strip search or line search—but they found nothing.[12] Revill's mother said that search dogs or cadaver dogs had come to her house but had not found anything.[13]

An officer in the Crime Scene Search Unit took five different swabs for DNA on various areas of Revill's car's trunk. The assumption, as articulated by the crime-scene officer, was that someone had been in the trunk. DNA recovered from those swabs excluded Typhenie.[14]

---

[12]At one point, Typhenie's case was transferred to the homicide unit. Unable to find a body, the homicide unit returned Typhenie's case to the major-case unit.

[13]"[Cadaver dogs'] work may seem similar to search[-]and[-]rescue dogs, but cadaver dogs play a distinctly different role. While [search-and-rescue dogs are] trained to pick up the general scent of humans, cadaver dogs specialize in detecting decomposing [human] flesh." Laura Mueller, *What to Know About Cadaver Dogs: What Cadaver Dogs Do, and More You Should Know*, The Spruce Pets (June 3, 2021), https://www.thesprucepets.com/cadaver-dogs-1113771 (last visited June 21, 2021).

[14]Because the assumption was that Revill had placed Typhenie in the trunk, the crime-scene officer swabbed only the trunk for DNA. But given the clutter in the trunk, Officer Smith's reservations about fitting a body into the trunk with all the clutter, and Asher's having seen both the front and rear driver's-side doors open at the same time as the trunk, the backseat might have been an unexplored option.

The black sock that Asher found in the grassy area—the sock that resembled the type that Typhenie normally wore—contained a mixture of two individuals' DNA but not enough of either for comparison purposes.

Neither the smartwatch nor its wristband found in Revill's mother's backyard produced any DNA. The DNA analyst opined that he would have expected to have found DNA on the watch.

The silver bracelet found in the backyard produced a DNA mixture of at least two individuals, but the partial profiles were insufficient for comparison purposes.

Finally, Revill did not exhibit any scratches, welts, or blood on his person. Curiously, despite that, Revill's blood was found on the white tee found in the backyard and on some of the clothing that Revill was wearing—a white ankle sock, his blue denim pants, and his long-sleeved shirt.

### e. Revill's phone was examined; his texts to Typhenie showed his frustration with his relationship with her.

Zachary Martin, a detective in the visual-forensics lab, examined Revill's phone. The vast majority of texts had been deleted, but Detective Martin had managed to recover some of them. Detective Martin read to the jury two of Revill's more effusive texts to Typhenie:

> [T]he first message says, "Yes, you are. It's my last mission. So be ready. I won't rest until I'm looking you in your eyes, speaking my vows, and hearing you say, [']I do.[']" And there's some emojis in there. And the second message, "No, that's crazy. I got one, though. Did you know that you're going to be my wife one day?" More emojis.

24

Detective Martin related that Revill had other messages in which he was upset and confrontational with Typhenie.

Below are a few examples that were read to the jury:[15]

- Fuck you. [What do you] [e]xpect me to do, huh, wait on you to find yourself[?] Wait on you to break it to me that I can no longer stay there[?] . . . I'll be goddammed if I sit out in the cold [while] someone [who] so-called cares and so-called loves me[] watches me do it. So if staying around to go through all that is cool with you, then you don't give two shits about me[,] and don't ever say otherwise.

- You hurt me more than anyone ever could. I'll never forgive or forget that.

- The best thing to ever happen to me did the worst [thing] that's ever happened to me. As long as you [are] good, though, right?

- [The only person] seeing [the] change [that] you claim to have made is you. You [have] fucking seen every one of my changes[,] and you still shit on me. I can't fucking stand you.

- You quit on me. Oh, I fucking hate you. I swear to God.

- I fucking hate you. I hate that you made me love you like this.

- My only goal is to have you as my baby[] and to do all I can to see you find me in your heart when I get all of you figured out. I've never given up on anything, and that's what has gotten me all the good I have now. I just can't see giving in now. I can't.

- If it's that you . . . no longer want to be with me, tell me. If it's 'cause you're playing the field, I want to know 'cause no matter what I say or how I say it, you don't care. And then you sound all encouraging

---

[15]To facilitate understanding, we took the liberty to slightly edit Revill's texts grammatically and, in a few instances, to paraphrase portions when his syntax was choppy.

and nice when you say[,] ["G]o,["] but [then you] go to cussing and getting an attitude when you said[,] ["I]f you don't want to go.  Then don't fucking go.["]

- I've heard enough.  I don't know why you want me gone so bad.  But you need to tell me why you do.  There is not one single reason that you should be pushing me to do something that . . . not only [doesn't] benefit you but is against everything that I expressed already.  Something ain't right.  What's going on, Typhenie?  I want to know because you obviously don't respect [or] care how I feel about it.  You are pressing me to do something because you want me to do [something], and I want to know why right now.

- Didn't know I was there.  That's a good one, but yet you came out [of your] room and dropped off the keys [after hiding in your room] the entire four-and-a-half hours I was there.

- Right.  No, it's not drivable, and frankly I don't care.  That's your problem.  I'm more focused on me and what I have going on.  Your car is not [my] priority.  Ask your brother what's up with it.  He was the only one lending any kind of hand.  So he knows.  Now,[] I'd like t[o] enjoy the rest of my day in peace and not [be] bothered about your car again, which is the only reason you texted [me] to begin with after having told [me] another lie about [how you wanted to know] what's up with me and [how you were not going to text me about] your car from now on.  So thanks for being more concerned about that piece of shit than what's going on with me.  Now,[] let's try this again.  Good night, Typhenie.

- Like you really give a fuck.  Was your bed comfortable[?]  Good night, Typhenie.

- First of all, . . . all those times I texted you [about] all the different kinds of shit[,] and [I] either got shitty responses or no response at all.  I could[n't] care less about how you feel [or about how my responses to your texts might upset you].  I don't give two shits about you[r] saying good morning.  It's nothing like when you used to say the things you used to every day.  So if you don't like it, who gives a fuck[?]  You didn't care when it was me texting you and you sending a shitty text back.

Revill's phone also revealed that from 7:48 p.m. until 8:07 p.m. on October 10, 2016, Revill made fifty-one Google searches using Typhenie's name. Although Detective Martin was not certain, he thought that perhaps Revill was trying to use the phone's voice-to-text function[16] but that the phone processed his attempts as Google searches instead.

### f. Tracking the locations of Revill's cell phone was consistent with Revill's having gone to his mother's house after leaving Asher and Typhenie's apartment on the night of Typhenie's disappearance.

Special Agent Mark Sedgwick, a member of the Federal Bureau of Investigation's Cellular Analysis Survey Team, examined Typhenie's and Revill's phone records for the evening of Typhenie's disappearance. From 9:48 p.m. until 11:01 p.m., Revill's phone showed nine calls from Asher. By 9:52 p.m., Revill had moved away from the tower that covered Typhenie's residence, and by 10:12 p.m., Revill had moved into an area serviced by another tower—the tower servicing the area encompassing Revill's mother's residence. After 11:01 p.m., Revill's phone was no longer connected to the network, "which mean[t] it was turned off, put in airplane mode, or something like that." As for Typhenie's phone, the last outgoing activity on it occurred at 9:14 p.m.

---

[16]A program that converts speech into text in real time.

### g. A surveillance camera captured what appeared to be Revill's vehicle going to and later leaving his mother's house.

The street leading to Revill's mother's house had but one ingress, and his mother's house itself was located on a cul-de-sac. Surveillance footage from a house near that point of ingress showed a vehicle with the same characteristics as Revill's car traveling toward his mother's home at 10:06 p.m. Forty-two minutes later, at 10:48 p.m., the surveillance footage captured a vehicle meeting the description of Revill's car leaving the area of his mother's home. No other vehicle like Revill's entered or exited during that time.

### h. A neighbor heard Revill's vehicle at his mother's house.

Alvarado, who lived near Revill's mother's house on the cul-de-sac, testified that on the night of October 10, 2016, her dog's growling woke her up around 10:30 p.m. The dog whimpered and then started pacing in front of the window. Unable to sleep, Alvarado heard Revill's voice towards the street, but she could not understand what he was saying. Because Alvarado heard only one voice, she thought that Revill was talking on his phone. About twenty minutes later, she heard Revill's vehicle speed off. She maintained that she had heard Revill's vehicle return about ten to fifteen minutes after that and, finally, leave after about another five minutes.

Although she never looked outside, Alvarado was certain that the vehicle she had heard was Revill's.[17]

### i. Revill's mother heard Revill come home, but he never came inside her house.

Revill's mother confirmed that he was living with her in October 2016. On October 10, sometime before 10:30 p.m. while she was watching a game on television, the dogs started barking, and she remembered telling her boyfriend that Revill must have arrived home. Although the dogs barked, Revill never came in, and she never saw him.

### j. Neither of the mechanics that Typhenie had previously sought help from came to her apartment that night.

The police investigated two men whom Typhenie had asked to work on her car. One was Typhenie's coworker; he told police that Typhenie had gotten her car fixed before he had gotten around to working on it.

The other was Anthony Maldonado, who testified that he had repaired Typhenie's brakes at her apartment about two days before she went missing. Maldonado related that while he had worked on her brakes, Typhenie had spoken

---

[17]Because the surveillance footage shows Revill's vehicle leaving the point of ingress only once, Alvarado's testimony that Revill's vehicle left his mother's house twice, if correct, is puzzling. Alvarado's testimony suggests that Revill left and returned to his mother's house without passing the point of ingress before leaving his mother's house a second time for good. A map showing the layout of the streets beyond the point of ingress was not introduced into evidence, so the record does not show how extensive the streets beyond the ingress point were.

about her ex-boyfriend and about how she was trying to distance herself from him. Because they had not purchased the correct part, Maldonado told Typhenie on October 8 that the brake fluid might leak. But he was not sure, so he told her to let him know if it leaked again and said that he would come right over and fix it.

Maldonado stated that two days later, on October 10, 2016, at 8:48 p.m., Typhenie had texted him to say that her brakes were out again. Maldonado said that he had texted back that he would fix the problem and that at 9:19 p.m., he had sent her an image of the correct part that they needed to purchase because the previous wheel cylinder that they had bought was not the correct one. Maldonado explained that if the problem was an emergency and that if he had no choice, he would work in the dark, but if it was not an emergency, he would wait until he had daylight. Maldonado asserted that he was texting Typhenie from his house, which was about a thirty-eight-minute drive from her apartment, and that his wife was with him that evening. When asked why his texts to Typhenie stopped that night, Maldonado stated that when Typhenie did not follow up, he figured that she had gotten someone else to fix her brakes.

### 4. A rational factfinder could have found beyond a reasonable doubt that Revill intentionally or knowingly abducted Typhenie with the intent to terrorize her.

Although the evidence is circumstantial, circumstantial evidence is as probative as direct evidence in establishing guilt. *See Jenkins*, 493 S.W.3d at 599. Based on the above evidence, a rational factfinder could have found beyond a reasonable doubt

30

that Revill intentionally or knowingly abducted Typhenie with the intent to terrorize her.

While motive is not itself enough to establish guilt, motive is a significant circumstance that may indicate guilt. *Nisbett v. State*, 552 S.W.3d 244, 265 (Tex. Crim. App. 2018). Revill was jealous and possessive, and Typhenie disappeared on the very evening that Revill discovered that Typhenie had a date with another man. Revill had a motive—to implement his threat that if he could not have Typhenie, no one could.

Revill contends that the verdict relies on speculation, not reasonable inferences. We disagree.

The Texas Court of Criminal Appeals has discussed the difference between inferences and speculation. *Hooper v. State*, 214 S.W.3d 9, 15–16 (Tex. Crim. App. 2007); *Tyler v. State*, 563 S.W.3d 493, 499 (Tex. App.—Fort Worth 2018, no pet.). An inference is a conclusion reached by considering other factors and deducing their logical consequence. *Hooper*, 214 S.W.3d at 16; *Tyler*, 563 S.W.3d at 499. In contrast, speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. *Hooper*, 214 S.W.3d at 16; *Tyler*, 563 S.W.3d at 499. Conclusions reached by speculation may not be completely unreasonable, but they are not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt. *Hooper*, 214 S.W.3d at 16; *Tyler*, 563 S.W.3d at 499. We permit jurors to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial, but jurors are not permitted to come to conclusions based on mere

31

speculation or factually unsupported inferences or presumptions. *Hooper*, 214 S.W.3d at 15–16; *Tyler*, 563 S.W.3d at 499.

The last time anyone (other than Revill) was able to establish Typhenie's location was when Asher heard her speaking to Revill in the grassy area next to the apartment building. Not only was her voice heard in this area but her cell phone and a sock of the same type she was seen wearing earlier in the evening were found there. After Revill came back to the apartment to fetch the drinks he had brought, Asher went to check the area where he had last heard Typhenie's voice and discovered Revill had backed his car into this area and parked it—an area where people did not normally park—with at least two doors and the trunk of his car open, and Revill appeared to be doing something behind the trunk. Within the time it took for Asher to walk around the building to obtain a better view of the rear of Revill's vehicle, Revill was leaving at "a pretty good clip." According to Asher, he began calling Revill almost as soon as he drove off, and the phone records indicate that the calls began at 9:48 p.m. Typhenie's last documented contact with the world was when her phone made its last outgoing text at 9:14 p.m., thirty-four minutes before Revill's hasty departure from the apartment complex.

Thus, Typhenie's ceasing to communicate with the world was in close temporal proximity to Revill's departure, and her last reported and documented location was in direct physical proximity to where Revill had inexplicably parked and where he had been seen inexplicably moving around his car while its doors and trunk were open. A

32

jury could reasonably infer that the person in close temporal and physical proximity to when and where Typhenie was last seen or heard from was involved in that loss of contact. This is especially true when that person was seen acting suspiciously behind the car and when that person was the only one who offered an explanation for how Typhenie had left the area—an explanation that was unverifiable and suspicious. And from the point of his departure from the grassy area onward, that person's behavior cast suspicion on him. And the person—so proximate in time and space to Typhenie's disappearance and who had previously told her that if he could not have her, no one could—on the evening of Typhenie's disappearance, encountered the very event capable of triggering him to make good on his threat. The cumulative force of this evidence permitted a jury to reasonably infer that Typhenie was abducted and that Revill was the one who had abducted her.

The jury also had evidence from which it could have reasonably inferred that Revill intended to terrorize Typhenie. The Texas Penal Code does not define "terrorize." When the legislature does not specially define a word, the word is to be understood as ordinary usage allows, and a factfinder may thus freely read statutory language to have any meaning that common parlance accepts. *Oler v. State*, 998 S.W.2d 363, 368 (Tex. App.—Dallas 1999, pet. ref'd, untimely filed). When wrestling with the term "terrorize," the Texas Court of Criminal Appeals has used the common dictionary definition as a guide: "to fill with intense fear or to coerce by threat or force." *Rogers v. State*, 687 S.W.2d 337, 341 (Tex. Crim. App. 1985) (citing *Rodriguez v.*

33

*State*, 646 S.W.2d 524, 527 (Tex. App.—Houston [1st Dist.] 1982, no pet.)). Generally, a person's actions reliably evidence the person's intent. *Id.* at 342. A defendant's actions and statements before a kidnapping, coupled with circumstantial proof of the defendant's abducting the victim, may sufficiently evidence the defendant's intent to terrorize. *Id.*

Here, the evidence showed that when Typhenie behaved in a manner that Revill did not like, he became angry and loud, confronted her face to face, and grabbed her arms. Typhenie's response was to quail. Instilling fear and coercing by threat or force were Revill's means of asserting control. According to Typhenie's mother, for example, Typhenie had gone so far as to alter her makeup, hair, and clothing to mollify Revill.

Turning to October 10, 2016, physically removing Typhenie from her dinner date with Brown would constitute coercion by force, and separating Typhenie from her cell phone—her only means of communicating with the outside world—and transporting her away involuntarily were acts that likely filled her with intense fear, especially when, as she had told her mother, Revill had previously told her that if he could not have her, no one else could. Once the jury found abduction, then the jury could infer Revill's intent from his actions. *See id.*

Also incriminating were Revill's lies and dissembling. Implausible explanations and attempts to conceal incriminating evidence are probative of knowledge of

wrongful conduct.  *Guevara*, 152 S.W.3d at 50.  The jury could have reasonably concluded that Revill lied when

- he told Asher that Typhenie had jumped in a car with a mechanic;

- he told Asher that he would make a U-turn and come right back;

- he told Asher that he could not talk because the police were pulling him over on Interstate 30;

- he told Officer Smith that Typhenie was talking to some old man about fixing her car when he had left;

- he told Officer Smith that he had parked by the dumpster to throw away loose trash;

- he told Officer Smith that he had turned around and had come back before reaching his mother's house;

- he denied parking in the grassy area when questioned by Detective Henz; and

- he attributed his sweaty condition to the heater in his car and to drinking alcohol.

If the jury disbelieved Revill, this string of lies was probative of his knowledge of wrongful conduct.  *Id.*

Finally, although Typhenie's DNA was not found in the trunk of Revill's car, her clothing was found in Revill's mother's backyard.  The jury could have reasonably disbelieved the argument that Revill's mother's dogs had dragged clothing that she had previously left behind into the backyard.

In circumstantial evidence cases, not every fact and circumstance must point directly and independently to the appellant's guilt; it is enough if the combined and cumulative force of all the incriminating circumstances warrant that conclusion. *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013). Viewing the evidence in the light most favorable to the verdict and given the combined and cumulative force of all the incriminating circumstances, we hold that a rational factfinder could have found beyond a reasonable doubt that Revill intentionally or knowingly abducted Typhenie with the intent to terrorize her. *See Queeman*, 520 S.W.3d at 622; *Temple*, 390 S.W.3d at 359. We overrule Revill's first point.

## IV. Admission of Evidence

In his second, third, and fourth points, Revill attacks the admission of Alvarado's testimony describing the two July 2016 encounters between Revill and Typhenie that she had observed. Specifically, in point two, Revill contends that the evidence was not relevant; in point three, he maintains that even if the evidence was relevant, its probative value was substantially outweighed by the danger of unfair prejudice; and in point four, he asserts that Alvarado lacked personal knowledge.

### A. Standard of Review

We review a trial court's decision to admit evidence under an abuse-of-discretion standard. *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006); *DeHarde v. State*, No. 02-19-00033-CR, 2020 WL 241985, at *2 (Tex. App.—Fort Worth Jan. 16, 2020, no pet.) (mem. op., not designated for publication). Under this

standard, we uphold the trial court's decision to admit evidence as long as it is within the zone of reasonable disagreement. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018); *Wright v. State*, 618 S.W.3d 887, 890 (Tex. App.—Fort Worth 2021, no pet.).

## B. Relevance

We start with the proposition that evidence must be relevant to be admissible. Tex. R. Evid. 401. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *Id.* Thus, to be relevant, evidence must be material and probative. *Miller v. State*, 36 S.W.3d 503, 507 (Tex. Crim. App. 2001). Irrelevant evidence is not admissible. Tex. R. Evid. 402; *see Griffin v. State*, No. 02-19-00020-CR, 2021 WL 126650, at *4 (Tex. App.—Fort Worth Jan. 14, 2021, pet. filed) (mem. op., not designated for publication).

Generally, when Person A and Person B end a relationship, and when Person B resumes dating, Person A does not resort to kidnapping Person B to prevent Person B from dating. For a kidnapping to occur under these circumstances, something out of the ordinary is happening. And yet in Revill's case, the State's theory was that when Revill saw that Typhenie was dating Brown, Revill kidnapped Typhenie.

For the State to prove its case, it was relevant for it to show what motivated Revill—control and jealousy—and how Revill intended to implement that control— by physical intimidation and force. Alvarado's description of the two July 2016 events

37

showed how Revill had responded when Typhenie had violated the boundaries that he had staked out for her on what some might consider relatively minor matters— whether she should answer his calls while she was driving and how she was dressed. *See* Tex. Code Crim. Proc. Ann. art. 38.371(b). As Typhenie's mother explained, "[Revill] didn't want other men looking at her." The degree to which Revill sought to control Typhenie was out of the ordinary and the ferocity with which Revill sought to enforce compliance with his wishes was also out of the ordinary. Other evidence showed that despite the breakup, Revill considered Typhenie's dating other men as cheating on him. After the breakup, Revill continued to go to Typhenie and Asher's apartment regularly to visit Asher and to question him about whether Typhenie was seeing someone else. The question for the jury was whether Revill had kidnapped Typhenie once he discovered that she was dating again. Alvarado's testimony showed the intensity of Revill's reaction when he thought that Typhenie had not acted as he thought she should and how he sought to control her behavior. We hold that the trial court acted within the zone of reasonable disagreement in finding Alvarado's testimony relevant, and we overrule Revill's second point.

## C. Probative Value Versus Danger of Unfair Prejudice

Rule 403 of the Texas Rules of Evidence provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence. Tex. R. Evid. 403. "Unfair

prejudice" refers only to relevant evidence's tendency to tempt the jury into finding guilt on grounds other than proof of the charged offense. *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005). Under Rule 403, the trial court must balance the inherent probative force of the proffered item of evidence, along with the proponent's need for that evidence, against (1) any tendency of the evidence to suggest decision on an improper basis, (2) any tendency of the evidence to confuse or distract the jury from the main issues, (3) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (4) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006); *Lumsden v. State*, 564 S.W.3d 858, 877 (Tex. App.—Fort Worth 2018, pet. ref'd). The Texas Court of Criminal Appeals has cautioned that when reviewing a trial court's Rule 403 balancing determination, we are to reverse the trial court's judgment rarely and only after a clear abuse of discretion. *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999); *Lumsden*, 564 S.W.3d at 877.

Alvarado's description of the two July 2016 events portrayed Revill's engaging in brutish behavior that did not depict him in a favorable light. This is the crux of Revill's complaint: Alvarado's testimony addressed events that had occurred months before the charged offense, events that he asserts were unrelated to the charged

39

offense, and events during which he had engaged in conduct that the jury would dislike and would likely hold against him.

To be sure, Alvarado's testimony was prejudicial, but the trial court admitted it in a manner to ensure that it was not unfairly prejudicial. Before Alvarado testified about the two July 2016 events, the trial court instructed the jury that it could not consider them unless it believed that the events had occurred beyond a reasonable doubt and, even then, that the jury could consider those two events only to determine motive or intent or to rebut any kind of defensive theory. *See* Tex. R. Evid. 404(b)(2). And after Alvarado testified about the two events, the trial court again gave the jury the same instruction. *See id.*

By giving these instructions, the trial court prohibited the jury from using this evidence to conclude that Revill was a bad person and, based on that conclusion, to find, regardless of the strength or weakness of any other evidence pertaining to the charged offense, that Revill had acted in conformity with that character on October 10, 2016. *See* Tex. R. Evid. 404(b)(1); *Mechler*, 153 S.W.3d at 440. Rather, the trial court instructed the jurors that they could use the events (assuming the jury believed beyond a reasonable doubt that the events had occurred) to gain insight into Revill's motives and intent vis-à-vis Typhenie and the alleged aggravated kidnapping. In short, the trial court's instructions tethered the events' relevance to the charged offense. *See Mechler*, 153 S.W.3d at 440–41 ("[The intoxilyzer results] are not unfairly prejudicial because this evidence relates directly to the charged offense."). Thus, the

40

evidence went beyond an attempt to portray Revill as a person of generally bad character, and the trial court sought to ensure that the jury would not use it to find Revill guilty because they might think him a bad person. "[T]he impermissible inference of character conformity can be minimized through a limiting instruction." *Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996). We presume that juries follow a trial court's limiting instructions. *James v. State*, No. 02-19-00427-CR, 2021 WL 1569159, at *10 (Tex. App.—Fort Worth Apr. 22, 2021, no pet. h.). We hold that the trial court acted within the zone of reasonable disagreement by finding that Alvarado's testimony was not unfairly prejudicial.

Finally, assuming the trial court had erred by overruling Revill's Rule 403 objections, he was not harmed. Ms. Johnson later testified without objection that Typhenie had told her that Revill was jealous and controlling, that there were arguments, and that sometimes Revill grabbed her wrists and her upper arms.[18] Generally, error in admitting evidence is harmless if very similar evidence was admitted without objection. *Bleimeyer v. State*, 616 S.W.3d 234, 256 (Tex. App.—Houston [14th Dist.] 2021, no pet.). We overrule Revill's third point.

## D. Personal Knowledge

"A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Tex. R.

---

[18]Revill objected to Ms. Johnson's testimony on the basis of personal knowledge; the trial court overruled his objection, and Revill has not pursued that objection as to Ms. Johnson on appeal.

41

Evid. 602. Personal knowledge may be based on personal observations. *Meza v. State*, 549 S.W.3d 672, 685 (Tex. App.—San Antonio 2017, no pet.). "A witness may assert the existence of a fact if his knowledge of that fact was gained through personal observation and reasonable inferences from that observation." *Skruck v. State*, 740 S.W.2d 819, 821 (Tex. App.—Houston [1st Dist.] 1987, pet. ref'd).

Revill complains that Alvarado knew him and Typhenie only by sight and was thus not familiar enough with either him or Typhenie to put their conversations in context or to properly interpret their physical and vocal cues; he thus concludes that her testimony amounted to speculation and conjecture. *See Turro v. State*, 950 S.W.2d 390, 403 (Tex. App.—Fort Worth 1997, pet. ref'd) (op. on remand). Revill argues that in *Turro*, we emphasized that the witness had "sufficient firsthand familiarity with [the two people having a conversation] to place a reasonable interpretation on [their vocal] inflections." *Id.* Revill misplaces his reliance on *Turro*.

In that case, while eavesdropping on an extension phone, the witness overheard a conversation between her sister and the defendant during which, in the context of a love triangle, her sister gave the defendant an ultimatum to choose her or the other woman. *Id.* at 401–03. The witness understood the defendant's response to be a threat to kill her sister if she broke off her relationship with him because of the other woman. *Id.* at 403.

Beyond the content of the conversation, the witness also had considerable background information. She knew that her sister and the defendant had dated and

lived together and that her sister had left the defendant's home, had moved in with her, and was looking for her own apartment. *Id.* at 397. Having eavesdropped on another telephone conversation between her sister and the other woman, she was also privy to this aspect of their relationship. *Id.* at 401.

We held in *Turro* that the witness had based her testimony on her personal knowledge: "[The witness] was personally listening to these conversations. She was able to perceive the inflections in both [her sister's] and [the defendant's] voices. [Her sister] was her sister[,] and [the defendant] was well-known to [the witness]." *Id.* at 403. In that context, we wrote that the witness "would have sufficient firsthand familiarity with both individuals to place a reasonable interpretation on these inflections." *Id.* We held that the trial court's ruling fell within the zone of reasonable disagreement: "It would be within the trial court's discretion to determine that [the witness's] opinions as to the emotional undercurrents of the telephone conversations were rationally based on her hearing perception." *Id.* at 399, 403.

In *Turro*, the witness was eavesdropping on an extension line, so she necessarily had to rely exclusively on what she had heard. In contrast, Alvarado both saw and heard the two events. Regardless, both could base their testimony on personal observations. *See Meza*, 549 S.W.3d at 685.

Next, the witness in *Turro* interpreted the exchange that she overheard, but she had a basis for doing so—her personal familiarity with the speakers, their history, and their current difficulties. Revill correctly notes that Alvarado did not have that same

43

familiarity with him or with Typhenie. Alvarado stated that she recognized Revill as her neighbor's son and recognized Typhenie as the woman who had stayed at Revill's mother's house for a while.

But in *Turro*, the witness's familiarity with the speakers and their difficulties were factors that added to her personal knowledge. Significantly, the first factor listed in *Turro* was that the witness had personally listened to the conversations. *Turro*, 950 S.W.2d at 403. Without this first factor, her familiarity with the speakers and their history was irrelevant.

The case on which *Turro* relied, *Jackson v. State*, involved a witness who testified about whether the defendant would be a continuing threat to society. 822 S.W.2d 18, 31 (Tex. Crim. App. 1990). Not surprisingly, that required some personal familiarity with the defendant. *Id.* To the extent that there were shortcomings to that personal familiarity, the court wrote that the witness's "competence to predict such future dangerousness goes to the weight rather than to the admissibility of the evidence." *Id.* at 32. Applying *Jackson* to *Turro*, that meant that the witness's personal familiarity with her sister, the defendant, and their situation were factors that might affect the weight jurors would give her testimony but were not factors that impacted whether her testimony was admissible. *See Turro*, 950 S.W.2d at 403.

Alvarado largely described what she saw and heard, but to the extent that she went beyond that and infused her subjective understanding (she described Typhenie as scared and Revill as angry), lay witness opinion testimony is admissible if it is

44

rationally based on the witness's perception and helpful to a clear understanding of the testimony or the determination of a fact in issue. *See id.* (citing what is currently Tex. R. Evid. 701). "An opinion is rationally based on perception if it is an opinion that a reasonable person could draw under the circumstances." *Fairow v. State*, 943 S.W.2d 895, 900 (Tex. Crim. App. 1997). For example, a person observing a bank robber pulling a gun on a cashier and saying, "Stick 'em up," does not need to have personally known the bank robber or the cashier to understand the context or to understand the verbal and physical cues. The interactions that Alvarado had observed were contextually self-explanatory, and the verbal cues that Alvarado had heard and the physical cues that she had seen were not laced with subtleties but were manifest. "[W]hile a witness cannot possess personal knowledge of another's mental state, [s]he may possess personal knowledge of facts from which an opinion regarding mental state may be drawn. The jury is then free to give as much or as little weight to the opinion as it sees fit." *Id.* at 899.

We hold that the trial court acted within the zone of reasonable disagreement in finding Alvarado's testimony was based on her personal knowledge. *See Meza*, 549 S.W.3d at 685; *Skruck*, 740 S.W.2d at 821. To the extent that Alvarado injected her own deductions into her testimony, we hold that the trial court acted within the zone of reasonable disagreement in finding that her testimony was rationally based on her perceptions. *See Turro*, 950 S.W.2d at 403. We overrule Revill's fourth point.

## V. Conclusion

Having overruled all four points, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: June 24, 2021